UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DAVID HILDERBRAND, DAVID KIDERMAN,   :
RYAN DETZEL, and MARK MILLER,   :
    :   Case No.: 16-cv-04040
    Plaintiffs,   :
    :   FIRST AMENDED
    :   <u>COMPLAINT</u>
    - against -   :
    :   JURY TRIAL DEMANDED
DOWNING INVESTMENT PARTNERS, LP,   :
DOWNING PARTNERS, LLC, DOWNING   :
HEALTH TECHNOLOGIES, LLC, f/k/a   :
DOWNING DIGITAL HEALTHCARE GROUP,   :
LLC, SURGICAL SAFETY SOLUTIONS, LLC,   :
3SI SYSTEMS, LLC, IVC HEALTHCOM, LLC,   :
DAVID W. WAGNER, MICHAEL H. SHAUT,   :
GREG AUDA, RICHARD BUCKINGHAM,   :
JEFF RICE, MARC M. LAWRENCE,   :
MICHAEL GRUMBINE, BRETT GIFFIN,   :
JAY PILA, PAUL GIROUX, MARCO ZENATI,   :
GEORGE ROBBIE, GLENN HAUFLER,   :
and BRAD PULVER,   :
    :
    Defendants.   :
-------------------------------------------------------------x

  Plaintiffs David Hilderbrand, David Kiderman, Ryan Detzel and Mark Miller

(collectively, "Plaintiffs"), by their attorneys, Carmel, Milazzo & DiChiara LLP, as and

for their First Amended Complaint, allege as follows:

### <u>NATURE OF THE ACTION</u>

  1. This action arises out of an outright fraud and a novel Ponzi scheme

perpetrated by Defendants.  Defendants recruited Plaintiffs to be employees, entered into

employment agreements which provided for a salary, commission, bonus, and expense

reimbursement, and as a condition of their employment, required Plaintiffs to make a

minimum investment of $250,000 each in a private placement in either Defendant

Downing Health Technologies, LLC ("Downing Health"), Surgical Safety Solutions,

LLC ("Surgical Safety") or IVC Healthcom, LLC ("IVC") (collectively, the "Downing Private Placement"), all controlled and owned by Downing Investment Partners, LP, Downing Partners, LLC, David W. Wagner, Michael H. Shaut, Richard Buckingham and Marc M. Lawrence.  Plaintiffs, induced by these promises entered into employment agreements with the corporate Defendants and each made the required $250,000 investment.

2.      Upon information and belief, at the time Defendants entered into employment agreements with Plaintiffs, they had already ceased paying their current employees' salaries, and used Plaintiffs' investments in the Downing Private Placement to pay past compensation due to other current employees.

3.      Indeed, almost immediately after beginning their employment with Defendants, Defendants ceased paying Plaintiffs their contractually required salaries, and failed to reimburse them for their expenses, or provide them with health insurance, in direct violation of the Fair Labor Standards Act ("FLSA"), New York Labor Law, California Labor Law, Ohio Labor Law and their respective employment agreements.

4.      Additionally, Defendants committed fraud in the offer and sale of the Downing Private Placement investments.  Specifically, the Downing Private Placement offering materials contain numerous material misrepresentations and omissions concerning Downing's business lines, the progress of Downing's proprietary products, prior rounds of funding and investments, Downing's financial condition, and the vendors with whom Downing was doing business.

5.      The Defendants, by engaging in the conduct described in this Complaint, have violated the antifraud provisions of the federal securities laws, committed common law fraud, and violated the FLSA, New York Labor Law, Ohio Law and California law.

6.      Plaintiffs seek to recover compensatory, consequential and punitive damages as a result of Defendants' wrongful conduct and Plaintiffs' unpaid wages for work they performed, reimbursement of their expenses, together with reasonable attorneys' fees, costs of this action, pre- and post-judgment interest, and other appropriate relief pursuant to the FLSA, New York Labor Law, California Labor Law, Ohio Labor Law and the federal securities laws.

## PARTIES

7.      Plaintiff David Kiderman is an individual, and a citizen of the State of New York, residing in Manhattan, New York.

8.      Plaintiff David Hilderbrand is an individual, and a citizen of the State of California, residing in El Dorado Hills, California.

9.      Plaintiff Ryan Detzel is an individual, and a citizen of the State of Ohio, residing in Highland Heights, Ohio.

10.     Plaintiff Mark Miller is an individual, and a citizen of the State of California, residing in San Clemente, California.

11.     Upon information and belief, Defendant Downing Investment Partners, LP, is a limited partnership organized and existing pursuant to the laws of the State of Delaware, with its principal place of business at 590 Madison Avenue, 14th Floor, New York, New York 10022.

12.     Upon information and belief, Defendant Downing Partners, LLC, is a limited liability company organized and existing pursuant to the laws of the State of Delaware, with its principal place of business at 590 Madison Avenue, 14th Floor, New York, New York 10022.

13.     Upon information and belief, Defendant Downing Health Technologies, LLC, f/k/a Downing Digital Healthcare Group, LLC ("Downing Health"), is a limited liability company organized and existing pursuant to the laws of the State of Delaware, with its principal place of business at 590 Madison Avenue, 14th Floor, New York, New York 10022.

14.     Upon information and belief, Defendant Surgical Safety Solutions, LLC ("Surgical Safety"), is a limited liability company organized and existing pursuant to the laws of the State of Delaware with its principal place of business at 25 Corporate Drive, 3rd Floor, Burlington, Massachusetts 01803.

15.     Upon information and belief, Defendant IVC Healthcom, LLC ("IVC"), is a limited liability company organized and existing pursuant to the laws of the State of Delaware with its principal place of business at 25 Corporate Drive, 3rd Floor, Burlington, Massachusetts 01803.

16.     Upon information and belief, Defendant 3si Systems LLC ("3si"), is a limited liability company organized and existing pursuant to the laws of the State of Delaware with its principal place of business at 25 Corporate Drive, 3rd Floor, Burlington, Massachusetts 01803.  Upon information and belief, Defendants Surgical Safety, IVC, and Downing Health have been consolidated into 3si, and as such, 3si is the successor in interest to the aforementioned entities.

17.     Upon information and belief, Downing Investment Partners, LP and Downing Partners, LLC are the majority equity owners and have complete control over Downing Health, Surgical Safety, IVC and 3si.

18.     Upon information and belief, Defendant David W. Wagner ("Wagner") is an individual and citizen of the State of Rhode Island.  Wagner is the Chairman and Managing Partner of Defendant Downing Partners, LLC, and the Chief Executive Officer of Defendants Downing Investment Partners, LP, Downing Health, Surgical Safety, IVC and 3si.

19.     Upon information and belief, Defendant Michael H. Shaut ("Shaut") is an individual and citizen of the State of Ohio.  Shaut is the President, Board Member and Senior Managing Director of Defendants Downing Investment Partners, LP, Downing Partners, LLC, Downing Health, Surgical Safety, IVC and 3si.

20.   ·   Upon information and belief, Defendant Richard Buckingham ("Buckingham") is an individual and citizen of the State of New Hampshire. Buckingham is the Co-Founder, Board Member and Vice-Chairman of Defendants Downing Partners, LLC, Downing Investment Partners, LP, Downing Health, Surgical Safety, IVC and 3si.

21.     Upon information and belief, Defendant Jeff Rice ("Rice") is an individual and citizen of the State of Massachusetts.  Rice is the Chief Administrative Officer of Defendants Downing Partners, LLC, Downing Health, Surgical Safety, IVC and 3si.

22.     Upon information and belief, Defendant Marc M. Lawrence ("Lawrence") is an individual and citizen of the State of Florida.  Lawrence is the President and Chief

Operating Officer of Defendants Downing Partners, LLC, Downing Health, Surgical

Safety, IVC and 3si.

23.     Upon information and belief, Defendant Brett Giffin ("Giffin") is an

individual and citizen of the State of New York.  Giffin is the President and Chief

Executive Officer of Defendants Downing Health, Surgical Safety, IVC and 3si, and

President and General Manager of Defendant Downing Partners, LLC.

24.     Upon information and belief, Defendant Jay Pila ("Pila") is an individual

and citizen of the State of New Jersey.  Pila is the former President and General Manager

of Defendant Surgical Safety.

25.     Upon information and belief, Defendant Paul Giroux ("Giroux") is an

individual and citizen of the State of New Hampshire.  Giroux is the former Chief

Marketing Officer of Defendant Downing Partners LLC and former President & General

Manager of IVC.

26.     Upon information and belief, Defendant Marco Zenati ("Zenati") is an

individual and citizen of the State of Massachusetts.  Zenati is a Co-Founder of

Defendants Downing Partners LLC, Downing Investment Partners, LP, Downing Health,

Surgical Safety, IVC and 3si.

27.     Upon information and belief, Defendant Brad Pulver ("Pulver") is an

individual and citizen of the State of Ohio.  Pulver is the former President and General

Manager of Defendant Downing Health.

28.     Upon information and belief, Defendant George Robbie ("Robbie") is an

individual and citizen of the State of Georgia.  Robbie is the President and General

Manager of Defendants Downing Health, Surgical Safety, IVC and 3si.

29.     Upon information and belief, Defendant Greg Auda ("Auda") is an individual and citizen of the State of Pennsylvania.  Auda is the Chief Commercial Officer of Defendants Downing Health, Surgical Safety, IVC and 3si.

30.     Upon information and belief, Defendant Glenn Haufler ("Haufler") is an individual and citizen of the State of Massachusetts.  Haufler is the President and General Manager of Defendants Downing Health, Surgical Safety, IVC and 3si.

31.     Upon information and belief, Defendant Michael Grumbine ("Grumbine") is an individual and citizen of the State of New Mexico.  Grumbine is the Chief Technology Officer of Defendants Downing Health, Surgical Safety, IVC and 3si.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over Plaintiffs federal claims pursuant to 28 U.S.C. § 1331, as certain of Plaintiffs' claims arise under federal statutes, specifically the FLSA and Securities Exchange Act of 1934.

33.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 as they arise out of the same transactions and occurrences as the federal claims, and all are so related that they form part of the same case and controversy.

34.     Venue is proper in this district pursuant to the 29 U.S.C. § 216, and 28 U.S.C. § 1391(b)(2), and Section 27 of the Securities Exchange Act of 1934, as a substantial part of the events giving rise to this action occurred in the State of New York, County of New York.

35.     This Court has personal jurisdiction over Defendants.  The Court has personal jurisdiction over Defendants located in New York pursuant to CPLR § 301

because they are New York citizens and/or that maintain their principal places of business in the State of New York, County of New York.

36.     The Court has personal jurisdiction over the non-New York Defendants pursuant to CPLR § 302(a)(1), (2) and (3).  Defendants' transacted business in New York from which this action arises.  Further, Defendants committed torts in New York, and committed torts outside of New York causing injury in New York.

<u>**FACTS COMMON TO ALL CLAIMS**</u>

**A.  Plaintiffs' Recruitment and Defendants' Representations**

37.     Beginning in late 2014, through early 2015, Defendants Wagner, Shaut, Pila, Pulver, Lawrence and Giroux began actively recruiting Plaintiffs to invest in the Downing Private Placement, and become employees of Defendants Downing Health, Surgical Safety, IVC, all now known as 3si, which are owned and controlled by Downing Partners, LLC and Downing Investment Partners, LP (collectively, these entities are referred to herein as "Downing").

38.     Defendants Wagner, Shaut, Pila, Pulver, Giroux and Lawrence pitched Downing as an opportunity to work for a venture capital firm, and Plaintiffs would have the opportunity to sell several different products which were already commercialized, generating revenue, and that Plaintiffs' potential commissions from the sale of these products would be uncapped.

***Plaintiff Detzel***

39.     In January 2015, Plaintiff Detzel met with Defendants Shaut and Pulver at Downing's office in Shaker Heights, Ohio.  During this meeting, Plaintiff Detzel interviewed with both Defendants Shaut and Pulver separately, one-on-one.

40.     During these meetings, Defendants Shaut and Pulver told Plaintiff Detzel that Downing had raised $25,000,000 in investments, excluding Downing employees, that Downing had no issues with its current burn rate, and was well funded with outside investments moving forward.

41.     Defendants Shaut and Pulver further explained that the products Plaintiff Detzel would be selling have been commercialized, were generating revenue, and that Plaintiff Detzel's commissions would be uncapped.

42.     Defendants Shaut and Pulver advised Plaintiff Detzel that each employee would be required to invest $250,000 in the Downing Private Placement.  They further stated that Downing was well funded, and that Plaintiff Detzel's investment would be "extra money" into Downing.

43.     Defendant Pulver represented that he had had personally invested $250,000 in the Downing Private Placement.

44.     Defendant Shaut represented to Plaintiff Detzel that the valuation of the Downing Private Placement was going to increase significantly in the next thirty (30) days, and that by investing now, Plaintiff Detzel's investment would be worth two times (2x) what it would be if he waited.

45.     Defendants Shaut and Pulver further represented the following, which were also set forth in the Downing Private Placement offering materials provided to Plaintiff Detzel:

- That Downing had certain distribution agreements in place with medical device companies, including, but not limited to, Intelesens, Vectracorp and FlexLife;

- That Downing's portfolio company Innovative Medical Equipment had $4 million in revenue;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC had five (5) beta sites up and running, and they were being used in a clinical setting;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC had $5 million in revenue in the pipeline;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC was in the process of negotiating 38 contracts;

- That Downing portfolio company SmartCool had a working prototype of its temperature management system;

- That Downing had raised $25 million in capital from investors, excluding recruited employees that invested as part of their employment;

- That Downing had millions of dollars of cash on hand in order fund the business;

- That Medrobotics Corporation was a portfolio company of Downing;

- That Downing had secured a $4 million investment which could be used as a "lever" at any time to infuse Downing with capital, as necessary.

46.     On or about February 4, 2015, Plaintiff Detzel met again with Defendant Shaut who again represented all of the foregoing regarding Downing and the Downing Private Placement.

47.     Relying on the above representations, Plaintiff Detzel invested the required $250,000 into Downing Health via a private placement and commenced his employment.

48.     All of the above-representations made by Defendants Shaut and Pulver, as well as those contained in the Downing Private Placement offering materials turned out to be false, and were known to be false when made.

49.     After commencing his employment at Downing, and investing $250,000 into Downing Health via a private placement, Plaintiff Detzel learned that all of the above representations were false.

***Plaintiff Kiderman***

50.     In or about January 2015, Plaintiff Kiderman received an email from a former colleague Nate Craft which contained a PowerPoint presentation created by Defendants Shaut and Wagner.  Indeed, this PowerPoint presentation contains numerous misrepresentations regarding Downing, including those set forth below.

51.     On or about February 27, 2015, Plaintiff Kiderman had a meeting with Defendants Shaut and Pulver at their office in Ohio.  During this meeting, both Defendants Shaut and Pulver told Plaintiff Kiderman that Downing had raised $25,000,000 in investments, excluding Downing employees, that Downing had no issues with its current burn rate, and was well funded with outside investments moving forward.

52.     Defendants Shaut and Pulver further explained that the products Plaintiff Kiderman would be selling have been commercialized, were generating revenue, and that his commissions would be uncapped.

53.     Defendants Shaut and Pulver advised Plaintiff Kiderman that each employee would be required to invest $250,000 in the Downing Private Placement.  They further stated that Downing was well funded, and that Plaintiff Kiderman's investment would be "extra money" into Downing.

11

54.     Defendant Pulver represented that he had had personally invested $250,000 in the Downing Private Placement.

55.     Defendants Shaut and Pulver further represented the following, which were also set forth in the Downing Private Placement offering materials provided to Plaintiff Kiderman:

- That Downing had certain distribution agreements in place with medical device companies, including, but not limited to, Intelesens, Vectracorp and FlexLife;

- That Downing's portfolio company Innovative Medical Equipment had $4 million in revenue;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC had five (5) beta sites up and running, and they were being used in a clinical setting;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC had $5 million in revenue in the pipeline;

- That Downing portfolio company Defendant Surgical Safety Solutions, LLC was in the process of negotiating 38 contracts;

- That Downing portfolio company SmartCool had a working prototype of its temperature management system;

- That Downing had raised $25 million in capital from investors, excluding recruited employees that invested as part of their employment;

- That Downing had millions of dollars of cash on hand in order fund the business;

- That Medrobotics Corporation was a portfolio company of Downing;

- That Downing had secured a $4 million investment which could be used as a "lever" at any time to infuse Downing with capital, as necessary.

56.     Relying on the above representations, Plaintiff Kiderman invested the required $250,000 into Downing Health via a private placement and commenced his employment.

57.     All of the above-representations made by Defendants Shaut and Pulver, as well as those contained in the Downing Private Placement offering materials turned out to be false, and were known to be false when made.

58.     After commencing his employment at Downing, and investing $250,000 into Downing Health via a private placement, Plaintiff Kiderman learned that all of the above representations were false.

***Plaintiff Miller***

59.     In April 2015, Plaintiff Miller was introduced to Defendant Giroux to discuss potential employment and an investment in Downing owned company, IVC.

60.     On May 4, 2015, Plaintiff Miller flew to Philadelphia, Pennsylvania for an in-person interview with Defendant Giroux, and former Downing employee Doug Regula.

61.     During this meeting, Defendant Giroux pitched the opportunity as a chance to work for, and invest in, a venture capital company (i.e. Downing).

62.     Defendant Giroux further represented that Downing, and IVC, were cash positive and IVC had approximately twelve (12) months of working capital in order fund the company moving forward.

63.     Defendant Giroux represented, and as set forth in the IVC private placement offering materials, IVC had previously received $2,500,000 in investments in order to fund the company.

64.     Relying on the above representations, Plaintiff Miller invested the required $250,000 into IVC via a private placement and commenced his employment.

65.     All of the above-representations made by Defendant Giroux, as well as those contained in the IVC private placement offering materials turned out to be false, and were known to be false when made.

66.     After commencing his employment at Downing, and investing $250,000 into IVC via a private placement, Plaintiff Miller learned that all of the above representations were false, and also learned that Defendant Giroux omitted to tell him that he had not been paid a salary or other compensation for or almost a year prior.

***Plaintiff Hilderbrand***

67.     In March 2015, Plaintiff Hilderbrand was contacted by a recruiter with respect to a potential employment opportunity with Downing.

68.     On or about May 4, 2015, Plaintiff Hilderbrand participated in a Skype call with Defendant Pila regarding Downing.   At the time, Defendant Pila represented that he was the President of Surgical Safety.

69.     On or about May 5, 2015, Defendant Pila sent Plaintiff Hilderbrand an email which contained a document titled "3si Executive Overview."

70.     The 3si Executive Overview contained numerous misrepresentations which were not discovered until after Plaintiff Hilderbrand commenced his employment with Downing and invested $250,000 into Surgical Safety via a private placement.  These misrepresentations included, but are not limited to:

- Surgical Safety milestones such as the status of the beta sites, beta participants, its commercial sales launch and commercial system installations; and

- The financial model which contained alleged investments/funding into Surgical Safety, and its operating expenses, revenue, profit, cash balances, and purchase orders.

71.     On or about May 12, 2015, Plaintiff Hilderbrand was contacted by Defendant Lawrence who advised him that he was the President and Chief Operating Officer of Defendant Downing Health, and that Defendant Pila had been terminated from Downing.

72.     On or about May 14, 2015, Plaintiff Hilderbrand received an email from a recruiter working for Downing, which contained a PowerPoint presentation regarding Downing.  Plaintiff Hilderbrand would later learn after he commenced his employment that this presentation contained numerous misrepresentations regarding Downing.  These include, but are not limited to, the following:

- Surgical Safety had five (5) beta sites;

- The beta site had been commercialized;

- Surgical Safety was involved in thirty eight (38) active contract discussions; and

- Downing had $5 million in its pipeline described as annual contract value.

73.     On or about May 22, 2015, Plaintiff Hilderbrand met with Defendant Lawrence in Las Vegas, Nevada at the Four Seasons Hotel.  During this meeting, Defendant Lawrence represented the following:

- That Downing had certain distribution agreements in place with medical device companies, including, but not limited to, Intelesens, Vectracorp and FlexLife;;

- That Downing's portfolio company Innovative Medical Equipment had $4 million in revenue;

- That Downing portfolio company Defendant Surgical Safety had five (5) beta sites up and running, and they were being used in a clinical setting;

- That Downing portfolio company Defendant Surgical Safety had $5 million in revenue in the pipeline;

- That Downing portfolio company Defendant Surgical Safety was in the process of negotiating 38 contracts;

- That Downing portfolio company SmartCool had a working prototype of its temperature management system;

- That Downing had raised $25 million in capital from investors, excluding recruited employees that invested as part of their employment;

- That Downing had millions of dollars of cash on hand in order fund the business;

- That Medrobotics Corporation was a portfolio company of Downing;

- That Downing had secured a $4 million investment which could be used as a "lever" at any time to infuse Downing with capital, as necessary.

74.     Relying on the above representations, Plaintiff Hilderbrand invested the required $250,000 into Surgical Safety via a private placement and commenced his employment.

75.     All of the above-representations made by Defendants Lawrence and Pila, as well as those contained in the Surgical Safety private placement offering materials turned out to be false, and were known to be false when made.

76.     After commencing his employment at Downing, and investing $250,000 into Surgical Safety via a private placement, Plaintiff Hilderbrand learned that all of the above representations were false.

### B.  Plaintiffs' Employment Agreements

77.     On or about January 26, 2015, in reliance on the representations set forth above, Plaintiff Detzel accepted an offer of employment with Downing set forth in a written employment offer which included, *inter alia*, the following terms:

- A base compensation of one hundred fifty thousand dollars ($150,000) per annum;

- The term of Plaintiff Detzel's employment would be for two (2) years;

- Plaintiff Detzel would receive commissions 5% of all sales for all portfolio companies in his region, with no cap on his commission earnings;

- Plaintiff Detzel would receive a "Balanced-Selling" bonus of up to an additional fifty thousand dollars ($50,000) per annum;

- Plaintiff Detzel would receive variable compensation targeted at one hundred thousand dollars ($100,000) per annum;

- Plaintiff Detzel would be paid on a bi-monthly basis, with two payroll periods: (a) 1st through the 15th of each month; and (b) 16th through month-end;

- The cost of Plaintiff Detzel's health benefits would be covered 100% by Downing during the first year of employment;

- Plaintiff Detzel would be reimbursed for expenses, including but not limited to, travel, entertainment, professional organizations, or promotional expenses; and

- Plaintiff Detzel's investment of two hundred fifty thousand dollars ($250,000) into Downing Health, must be completed on or before February 1, 2015, or the employment offer will be rescinded.

78.     In reliance on the representations set forth herein, on February 5, 2015, Plaintiff Detzel invested $250,000 into Defendant Downing Health, via a private placement.

79.     On or about March 7, 2015, and in reliance on the representations set forth herein, Plaintiff Kiderman accepted an offer of employment with Downing which included, *inter alia*, the following terms:

- A base compensation of one hundred forty five thousand dollars ($145,000.) per annum;

- The term of Plaintiff Kiderman's employment will be for two (2) years;

- Plaintiff Kiderman would receive commissions at 5% of all sales for all portfolio companies in his region, with no cap on his commission earnings;

- Plaintiff Kiderman would receive variable compensation targeted at one hundred thousand dollars ($100,000) per annum;

- Plaintiff Kiderman would receive a "Balanced-Selling" bonus of up to an additional fifty thousand dollars ($50,000) per annum;

- Plaintiff Kiderman would paid on a bi-monthly basis, with two payroll periods: (a) 1st through the 15th of each month; and (b) 16th through month-end;

- That the cost of Mr. Kiderman's health benefits would be covered 100% by Downing during the first year of employment;

- Plaintiff Kiderman would be reimbursed for expenses, including but not limited to, travel, entertainment, professional organizations, or promotional expenses; and

- Mr. Kiderman's investment of two hundred fifty thousand dollars ($250,000) into Downing Health Technologies, LLC, must be completed on or before March 23 2015, or the employment offer would be rescinded.

80.     In reliance on the representations set forth herein, Plaintiff Kiderman invested his retirement savings of $250,000 into Downing Health, via a private placement.

81.     On or about May 11, 2015, and in reliance on the representations set forth herein, Plaintiff Miller accepted an offer of employment with Downing which included, *inter alia*, the following terms:

- Plaintiff Miller would receive a base compensation of one hundred seventy five thousand dollars ($175,000.) per annum;

- The term of Plaintiff Miller's employment would be for two (2) years;

- Plaintiff Miller would be eligible to earn a cash bonus of 30% of his base compensation;

- Plaintiff Miller would be paid on a bi-monthly basis;

- That the cost of Plaintiff Miller's health benefits would be covered 100% by Downing during the first year of employment;

- That Plaintiff Miller would be reimbursed for expenses, including but not limited to, travel, entertainment, professional organizations, or promotional expenses;

- Plaintiff Miller would receive twenty (20) business days of paid vacation per year; and

- Plaintiff Miller's investment of two hundred fifty thousand dollars ($250,000) into IVC, was required to be made by May 29, 2015, otherwise Downing could terminate the employment agreement with Mr. Miller immediately.

82.     In reliance on the representations set forth herein, Plaintiff Miller invested his retirement savings of $250,000 into IVC, via a private placement.

83.     On or about May 25, 2015, and in reliance on the representations set forth herein, Plaintiff Hilderbrand accepted an offer of employment with Downing which included, *inter alia*, the following terms:

- Plaintiff Hilderbrand would receive a base compensation of one hundred eighty five thousand dollars ($185,000.) per annum;

- The term of Plaintiff Hilderbrand's employment would be for two (2) years;

- Plaintiff Hilderbrand would receive an annual performance bonus of twenty five percent (25%);

- Plaintiff Hilderbrand would receive a stretch bonus of twenty thousand dollars ($20,000) for exceeding the annual sales plan by ten percent (10%) or more;

- Plaintiff Hilderbrand would be paid on a bi-monthly basis, with two payroll periods: (a) 1st through the 15th of each month; and (b) 16th through month-end;

- That the cost of Plaintiff Hilderbrand's health benefits would be covered 100% by Downing during the first year of employment;

- That Plaintiff Hilderbrand would be reimbursed for expenses, including but not limited to, travel, entertainment, professional organizations, or promotional expenses; and

- That Plaintiff Hilderbrand's investment of two hundred fifty thousand dollars ($250,000) into Downing Health.  If the investment was not made by June 5, 2015, then Downing could terminate the employment agreement with Plaintiff Hilderbrand immediately.

84.     In reliance on the representations set forth herein, Plaintiff Hilderbrand invested his retirement savings of $250,000 into Surgical Safety, via a private placement.

85.     Based upon, and reliance on the above representations, all of the Plaintiffs left their positions at their employers at the time, where they were each making between $175,000 and $500,000 a year, to join Defendants.

86.     As set forth more fully below, Plaintiffs investments in the Downing Private Placements were mandatory because, upon and information belief, Defendants were engaging in a Ponzi scheme, whereby they used Plaintiffs' investments to pay past compensation and wages due to Downing's employees, who were also investors into the Downing Private Placement.

**C.  Plaintiffs Commence Their Employment At Downing**

87.     After Plaintiffs became employed at Downing, they learned that there were no viable products to sell, and thus, no way to earn the commissions or bonuses set forth in their respective employment agreements.

88.     Further, almost immediately after Plaintiffs commenced their employment with Downing, Downing failed to meet payroll, and failed to pay Plaintiffs their contractually agreed to salaries, and other sums due under their respective employment agreements.

21

89.    Plaintiffs would later learn that they were not alone.  Indeed, the then current Downing employees had not been paid their salaries or expenses for a significant period of time prior to Plaintiffs joining Downing.

90.    Even more egregious, then current Downing employees were told not to mention this fact to new recruits, including Plaintiffs, and to conceal the fact that they were not receiving their salaries/compensation.

91.    In or about March 2015, Defendant Wagner changed the business model of Downing.  Specifically, the original model as pitched to Plaintiffs Detzel and Kiderman called for six (6) sales positions and six (6) business development positions. Defendant Wagner was looking to hire twenty-four sales/business development positions. Upon information and belief, Defendant Wagner increased the amount of sales/business development positions in order obtain additional $250,000 investments into the Downing Private Placement, and continue funding the Ponzi scheme.

92.    On or about June 16, 2015, approximately two weeks after Plaintiff Hilderbrand joined Downing, and after a sales meeting in Nashville, Tennessee, Plaintiff Hilderbrand was at dinner with Defendants Grumbine and Lawrence.  During this dinner, Defendant Grumbine advised Plaintiff Hilderbrand that several employees had not been paid and/or were in arrears.  Plaintiff Hilderbrand, shocked by this statement, turned to Defendant Lawrence and asked him if it was true that Downing's employees had not been paid and asked why Defendant Lawrence did not disclose this to him during his recruitment and before his investment.  Defendant Lawrence responded by stating "You did not ask and be quiet because other people are around."

93.     On or about August 24, 2015, Plaintiff Hilderbrand participated in a conference call with Defendant Giffin.  During this call, Defendant Giffin advised that Downing was shifting its strategy, and going forward it would no longer be relying on recruitment of new employees in order to fund Downing's operations.  This came as a shock as this was the first time anyone from Downing had admitted it was recruiting employees for the purpose of procuring investments/funding into Downing, despite the fact that Downing was not paying their current employees, including Plaintiffs, contractually agreed to salaries.

94.     On or about September 29, 2015, Plaintiffs discovered that Downing had failed to pay for Plaintiffs' health insurance, and that Plaintiffs had not been insured since July 31, 2015.

95.     Despite the fact that Plaintiffs were entitled to be reimbursed for expenses, including health insurance, and regularly submitted expense reports to Downing, Downing failed to pay expenses incurred by Plaintiffs from March 2015 to March 2016.

96.     On or October 26, 2015, Plaintiff Detzel met with Defendant Shaut at a local Starbucks regarding his failure to receive salary and reimbursement of expenses. Incredibly, after Plaintiff Detzel complained about not receiving his salary/expenses, Defendant Shaut stated "if [Detzel] would have asked him if people were being paid at the time [he entered into the employment agreement with Downing], he would have said no."

97.     Further, when Plaintiffs would complain about not receiving their salaries, expenses, or having a viable product to sell so that they could supposedly earn commissions, Defendants Wagner, Shaut, Buckingham, Rice, Lawrence, Grumbine,

Giffin, Giroux, Zenati, Robbie, Auda, Haulfer and Pulver would consistently assure them of the increased value of their Downing Private Placement investment, and that they would be paid their back-wages soon.

98.     By way of example, on December 27, 2015, Defendant Wagner sent a memorandum to Downing employees, including Plaintiffs.  In this memorandum, Defendant Wagner states, *inter alia*, that "any individual that made an original investment of $250,000 in either Downing Health Technologies or Surgical Safety Solutions…would yield a return of approximately $1.9 million to the individual investor."

99.     Upon information and belief, this representation, and others made by Defendants Wagner, Shaut, Buckingham, Rice, Lawrence, Grumbine, Giffin, Pila, Giroux, Zenati, Robbie, Auda, Haufler and Pulver were made with intent of inducing Plaintiffs to continue working, to assuage concerns of Downing's employees concerning their failure to receive salaries, and to conceal the fact that Defendants were engaged in a salary/investment, Ponzi scheme.

100.    Upon information and belief, Defendants knew that by making it mandatory for employees to invest in the Downing Private Placement, it would act as an anchor to keep Plaintiffs employed at Downing, despite not receiving their salaries or expenses, or being able to earn commissions.

101.    While Downing was unlawfully and wrongfully failing to pay Plaintiffs, and other Downing employees' salaries and expenses, Defendant Wagner was receiving $60,000 per month in "consulting" fees and diverting other monies from Downing.

24

102.    Upon information and belief, other officers and directors, including the individual Defendants, were receiving compensation from Downing, while Downing's employees were not paid a salary or reimbursed for their expenses.

103.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, Giroux, and Auda all possessed the power to hire and fire Plaintiffs, supervised or controlled Plaintiffs' work schedules or conditions of employment, determined the rate or method of payment to Plaintiffs, and/or maintained Plaintiffs' employee records.

104.    On or about November 16, 2015, Defendant Giroux resigned.  Upon information and belief, Defendant Giroux resigned because after a review of the books and records, he discovered the Ponzi scheme.

105.    Between December 2015 and March 2016, Plaintiffs resigned from their employment with Downing.

106.    Upon their resignation, the following salary and expenses were due and owing to Plaintiffs:

- Plaintiff Hilderbrand – approximately $164,359.55;

- Plaintiff Detzel - approximately $120,815.00;

- Plaintiff Kiderman - approximately $102,350.10; and

- Plaintiff Miller - approximately $49,041.39.

**D. The Ponzi Scheme**

107.    Unlike a traditional Ponzi scheme whereby a new investment is used to pay off an older investment, Defendants used the money invested by new employees,

which was mandatory as part of their employment, to pay back-wages due to select Downing employees.

108.   Upon information and belief, when Plaintiffs invested in the Downing Private Placement, their investment of $1,000,000 was used to re-ignite Downing's payroll and pay its employees, who were not receiving their wages for some time.

109.   Indeed when Plaintiffs complained about not receiving their salaries/expenses, Defendants told them to go find more investors to invest in the Downing Private Placement.

110.   At all relevant times, Defendants Wagner, Shaut, Buckingham, Rice, Lawrence, Grumbine, Giffin, Pila, Giroux, Zenati, Robbie, Auda, Haulfer and Pulver were officers, directors and/or owners of Downing.

111.   Upon information and belief, Defendants Wagner, Shaut, Buckingham and Lawrence directed, controlled and orchestrated the Ponzi scheme set forth herein.

### E.   Defendants Fraudulently Induce Plaintiff Miller to Enter into a Purported Settlement

112.   On December 7, 2015, Plaintiff Miller entered into an agreement, titled "General Release," with Defendants Downing Investment Partners, LP, Downing Partners, LLC and IVC whereby said entities agreed to issue Plaintiff Miller a promissory note in the amount of $250,000, plus 8% interest, to repurchase his ownership interest in the Downing Private Placement (the "Downing Note"). The purpose of the Downing Note was to resolve Plaintiff Miller's claims against Defendants for wages and his investment in the Downing Private Placement.

113.    The Downing Note provided for twenty-four (24) equal monthly installments of $11,307, commencing on March 30, 2016 and was signed by Defendant Shaut.

114.    To date, Defendants have failed to **make a single payment** on the Downing Note.

115.    Upon information and belief, at the time Defendants entered into the General Release and Downing Note, they never intended to pay Plaintiff Miller the moues due under the Downing Note.

116.    Upon information and belief, Defendants only entered into the General Release and Downing Note in a fraudulent attempt to preclude Plaintiff Miller from being able to initiate a legal action against Defendants.

<u>**AS AND FOR A FIRST CAUSE OF ACTION**</u>
**(Fraudulent Inducement As to Downing Note and Guaranty)**

117.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 116 of this Complaint as if set forth at length herein.

118.    As set forth in detail above, Defendants Downing Investment Partners, LP, Downing Partners, LLC, IVC and Shaut made material misrepresentations to induce Plaintiff Miller to enter into the General Release and Downing Note.

119.    Defendants Downing Investment Partners, LP, Downing Partners, LLC, IVC and Shaut made the foregoing misrepresentations with the intent to fraudulently induce Plaintiff Miller to execute the General Release and accept the Downing Note.

120.    At the time parties entered into the General Release and Downing Note, Defendants Downing Investment Partners, LP, Downing Partners, LLC, IVC and Shaut had no intention on paying the Downing Note.

121.    Defendants Downing Investment Partners, LP, Downing Partners, LLC, IVC and Shaut's representations concerning the General Release and Downing Note were false, and known to be false when they were made.

122.    Plaintiff Miller reasonably and justifiably relied upon Defendants Downing Investment Partners, LP, Downing Partners, LLC, IVC and Shaut's representations when signing the General Release and accepting the Downing Note.

123.    As a direct result of the foregoing, Plaintiff Miller has suffered injury.

124.    Based upon the foregoing, Plaintiff Miller is entitled to a judgment declaring the General Release and Downing Note to be void for fraud in the inducement.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fair Labor Standards Act – Minimum Wage)

125.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 124 of this Complaint as if set forth at length herein.

126.    At all relevant times, Plaintiffs were employees of Defendants within the meaning of 29 U.S.C. § 203(e)(1).

127.    At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda were Plaintiffs' employers within the meaning of 29 U.S.C. § 203(d).

128.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, Giroux, and Auda all possessed the power to hire and fire Plaintiffs, supervised or controlled Plaintiffs' work schedules or conditions of employment, determined the rate or method of payment to Plaintiffs, and/or maintained Plaintiffs' employee records.

129.     At all relevant times, Plaintiffs were engaged in commerce and/or Defendants were enterprises engaged in commerce within the meaning of 29 U.S.C. § 206(a).

130.     Defendants willfully failed to pay Plaintiffs' minimum wages, in violation of 29 U.S.C. § 206(a).

131.     Defendants' violations of the FLSA, as described herein, were willful and intentional.

132.     Due to Defendants FLSA violations, Plaintiffs are entitled to recover from Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, Giroux and Auda, jointly and severally, unpaid wages, an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs of the action, pursuant to 29 U.S.C. § 216(b), in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Violation of New York Labor Law § 190. et seq. – Plaintiff Kiderman)**

133.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 132 of this Complaint as if set forth at length herein.

134.     At all relevant times, Plaintiff Kiderman was an employee as that term is defined under § 190 of the New York Labor Law ("NYLL").

135.     At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda are all employers as that term is defined under § 190 of the NYLL.

136.     Defendants failed to pay Plaintiff Kiderman his wages at least seven calendar days after the week in which his wages were earned, in violation of § 191 of NYLL.

29

137.   Defendants failed to pay Plaintiff Kiderman his wages owed to him after he ceased working for Defendants by the next regular pay day, in violation of § 191 of NYLL.

138.   Defendants failed to pay Plaintiff Kiderman his expenses due and owing in violation of § 198-c of NYLL.

139.   As a result of Defendants' NYLL violations, Plaintiff Kiderman is entitled to recover from Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda, jointly and severally, the full amount of unpaid wages and expenses due and owing, liquidated damages equal to one hundred percent (100%) of the total amount of wages and expenses found to be due, reasonable attorneys' fees, and the costs of this action, pursuant to § 198 of NYLL, in an amount to be determined at trial.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Violation of Ohio Prompt Pay Act – Plaintiff Detzel)

140.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 139 of this Complaint as if set forth at length herein.

141.   The Ohio Prompt Pay Act ("OPPA") provides in relevant part:

Every individual, firm, partnership, association, or corporation doing business in this state shall, on or before the first day of each month pay all its employees the wages earned by them during the first half of the preceding month ending with the fifteenth day thereof, and shall, on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the preceding calendar month.

O.R.C. § 4113.15(A)

142.     At all relevant times, Plaintiff Detzel was an employee of Defendants within the meaning of the OPPA, and as such, was entitled to timely payment of wages due to him.

143.     At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda are employers within the meaning of the OPPA.

144.     Plaintiff Detzel's salary and expenses are within the meaning of "wage" under the OPPA.

145.     Defendants' failure to pay Plaintiff Detzel his wages due is a direct violation of the OPPA.

146.     As a result of Defendants' OPPA violations, Plaintiff Detzel is entitled to recover from Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda, jointly and severally, the full amount of unpaid wages owed to him, liquidated damages equal to six percent (6%) of the total amount of wages found due, reasonable attorneys' fees, interest, and the costs of this action, pursuant to Ohio law, in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Violation of California Labor Code §§ 201, 202 and 203 – Plaintiff Hilderbrand)

147.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 146 of this Complaint as if set forth at length herein.

148.     California Labor Code §§ 201, 202 and 203 require Defendants to pay all compensation due and owing to Plaintiff Hilderbrand immediately upon discharge or within seventy two hours of his termination of employment.

149.    At all relevant times, Plaintiff Hilderbrand was an employee of Defendants within the meaning of the California Labor Code.

150.    At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giffin, Robbie, Haufler, and Auda are employers within the meaning § 558.1 of the California Labor Code.

151.    California Labor Code § 227 provides that unused and vested vacation time shall be paid to employee as wages.  As Plaintiff Hilderbrand did not use his vested vacation time, and Defendants have not paid Plaintiff Hilderbrand his vacation time in wages, Plaintiff Hilderbrand is due additional wages as result of same.

152.    California Labor Code § 203 provides that if an employer willfully fails to pay wages promptly upon discharge or resignation, as required by §§ 201 and 202, then the employer is liable for such "waiting time" penalties in the form of continued compensation up to thirty workdays.

153.    Defendants willfully failed to pay Plaintiff Hilderbrand his compensation, including vested and unused vacation time, due upon termination as required by California Labor Code §§ 201, 202, 203 and 227.  As a result, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, and Auda are jointly and severally liable to Plaintiff Hilderbrand for wages due and "waiting time" penalties provided under California Labor Code §203, plus interest, reasonable attorneys' fees and costs of this action.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Violation of California Labor Code § 2802 – Plaintiff Hilderbrand)

154.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 153 of this Complaint as if set forth at length herein.

155.    At all relevant times, Plaintiff Hilderbrand was an employee of Defendants within the meaning of the California Labor Code.

156.    At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, and Auda are employers within the meaning § 558.1 of the California Labor Code.

157.    California Labor Code § 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

158.    Defendants failed to pay Plaintiff Hilderbrand for his health insurance and reasonable expenses incurred while performing his duties as an employee of Defendants.

159.    Plaintiff Hilderbrand is entitled to reimbursement of these necessary expenditures.

160.    As a result, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, and Auda are jointly and severally liable to Plaintiff Hilderbrand for expenses due and owing and "waiting time" penalties under California Labor Code § 2802, plus interest, attorneys' fees and costs of this action.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**(Violation of California Labor Code §§ 201, 202 and 203 – Plaintiff Miller)**

161.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 160 of this Complaint as if set forth at length herein.

162.    California Labor Code §§ 201, 202 and 203 require Defendants to pay all compensation due and owing to Plaintiff Miller immediately upon discharge or within seventy two hours of his termination of employment.

163.    At all relevant times, Plaintiff Miller was an employee of Defendants within the meaning of the California Labor Code.

164.    At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, Giroux and Auda are employers within the meaning § 558.1 of the California Labor Code.

165.    California Labor Code § 227 provides that unused and vested vacation time shall be paid to employee as wages.  As Plaintiff Miller did not use his vested vacation time, and Defendants have not paid Plaintiff Miller his vacation time in wages, Plaintiff Miller is due additional wages as result of same.

166.    California Labor Code § 203 provides that if an employer willfully fails to pay wages promptly upon discharge or resignation, as required by §§ 201 and 202, then the employer is liable for such "waiting time" penalties in the form of continued compensation up to thirty workdays.

167.    Defendants willfully failed to pay Plaintiff Miller his compensation, including vested and unused vacation time, due upon termination as required by California Labor Code §§ 201, 202, 203 and 227.  As a result, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, Giroux and Auda are jointly and severally liable to Plaintiff Miller for wages due and "waiting time" penalties provided under California Labor Code §203, plus interest, reasonable attorneys' fees and costs of this action.

### AS AND FOR A EIGTH CAUSE OF ACTION
**(Violation of California Labor Code § 2802 – Plaintiff Miller)**

168.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 167 of this Complaint as if set forth at length herein.

169.     At all relevant times, Plaintiff Miller was an employee of Defendants within the meaning of the California Labor Code.

170.     At all relevant times, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, Giroux and Auda are employers within the meaning § 558.1 of the California Labor Code.

171.     California Labor Code § 2802 provides that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."

172.     Defendants failed to pay Plaintiff Miller for his reasonable expenses incurred while performing his duties as an employee of Defendants.

173.     Plaintiff Miller is entitled to reimbursement of these necessary expenditures.

174.     As a result, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, Giroux and Auda are jointly and severally liable to Plaintiff Miller for expenses due and owing and "waiting time" penalties under California Labor Code § 2802, plus interest, attorneys' fees and costs of this action.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Breach of Contract)

175.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 174 of this Complaint as if set forth at length herein.

176.     On or about January 26, 2015, Defendant Downing entered into an employment agreement with Plaintiff Detzel, and Plaintiff Detzel invested in the Downing Private Placement.

177.    On or about March 7, 2015, Defendant Downing entered into an employment agreement with Plaintiff Kiderman, and Plaintiff Kiderman invested in the Downing Private Placement.

178.    On or about May 11, 2015, Defendant Downing entered into an employment agreement with Plaintiff Miller, and Plaintiff Miller invested in the Downing Private Placement.

179.    On or about May 25, 2015, Defendant Downing entered into an employment agreement with Plaintiff Hilderbrand, and Plaintiff Hilderbrand invested in the Downing Private Placement.

180.    Plaintiffs' employment agreement provided for annual salaries, reimbursement of expenses, commissions and mandatory investments into the Downing Private Placement.

181.    Plaintiffs fully performed their obligations under their respective employment agreements and the Downing Private Placement.

182.    To date, Defendant Downing has failed to pay approximately $164,359.55 to Plaintiff Hilderbrand, $120,815.00 to Plaintiff Detzel, $102,350.10 to Plaintiff Kiderman, and $49,041.39 to Plaintiff Miller in wages and expenses due and owing, with exact amounts to be determined at trial.

183.    Further, Plaintiffs' resignations were not voluntary, and were a result of Defendants failure to comply with their obligations under Plaintiffs' respective employment agreements.  As such, Plaintiffs are entitled to recover the salary owed and the remainder salary due under Plaintiffs' employment agreements.

184.    As a result of same, Defendant Downing is in breach of its employment agreements and Downing Private Placements with Plaintiffs.

185.    Based upon the foregoing, Plaintiffs are entitled to the recovery of damages in an amount in excess of $2,091,566.04, with an exact amount to be determined at trial.

**AS AND FOR A TENTH CAUSE OF ACTION**
**(Fraudulent Inducement)**

186.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 185 of this Complaint as if set forth at length herein.

187.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice Giroux, and Pulver materially misrepresented that they would pay Plaintiffs there agreed to salaries, expenses, and commissions, despite the fact that had already ceased paying their current employees' salaries prior to Plaintiffs becoming employed with Defendant Downing, and that Plaintiffs were not able to earn commissions because there were no viable products to sell.

188.    At the time Plaintiffs entered into their respective employment agreements with Downing, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver had no intention to pay Plaintiffs' their salaries or expenses due thereunder.

189.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver made numerous material misrepresentations concerning the terms and facts underlying Downing and the Downing Private Placements, including, but not limited to, the products it sold, the revenue it was generating, the cash on hand, and its

prior investments, all of which Plaintiffs reasonably relied on in deciding to invest in the Downing Private Placements and become employees of Defendant Downing.

190.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver's representations concerning Plaintiffs' employment and the Downing Private Placements were false, and known to be false when they were made.

191.    Upon information and belief, at the time Plaintiffs entered into their employment agreements, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver never intended to pay Plaintiffs their salaries and expenses, but made the representations in order to induce Plaintiffs to invest in the Downing Private Placements and accept employment with Downing.

192.    Plaintiffs reasonably and justifiably relied upon Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver representations, and invested in the Downing Private Placements and became employees of Defendant Downing.

193.    As a result of the foregoing, Plaintiffs have been damaged in an amount in excess of $2,091,566.04, with the exact amount to be determined at trial.

194.    Moreover, because Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver's conduct was willful and malicious, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but in no event less than $6,000,000.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Fraud)

195.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 194 of this Complaint as if set forth at length herein.

196.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver made untrue statements of material fact, or omitted to state materials facts necessary in order to make the statements not misleading, in connection with Plaintiffs' employment with Defendant Downing and investments in the Downing Private Placements.

197.    Defendants Giffin, Robbie, Grumbine, Haufler, Auda and Zenati knew of the misrepresentations and/or omissions and continued to support and spread the falsity of the misrepresentations and/or omissions.

198.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati knew of or recklessly ignored the falsity of their untrue statements or omissions of material fact.

199.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati intended that Plaintiffs rely on the misrepresentations or omissions of material fact when deciding whether to become employed at Downing, and whether to make an investment in the Downing Private Placements, and continued to make misrepresentations and omissions concerning same.

200.    Plaintiffs were ignorant to the falsity of the misrepresentations and omissions of material fact, and reasonably and justifiably relied upon those misrepresentations and omissions to their detriment.

201.    By reason of the foregoing, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati committed fraud against Plaintiffs.

202.    As a direct and proximate consequence of Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati misrepresentations or omissions, Plaintiffs suffered damages in an amount to be determined at trial, but not less than $2,091,566.04.

203.    Moreover, because Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati's conduct was willful and malicious, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but in no event less than $6,000,000.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (Negligent Misrepresentation)

204.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 203 of this Complaint as if set forth at length herein.

205.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver promised to pay Plaintiffs their salaries and reimbursement of their expenses, as well as the ability to earn commissions.

206.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver made certain representations and/or omissions regarding the facts underlying the Downing Private Placements.

207.    In reliance upon Defendants representations, Plaintiffs became employed at Defendant Downing and invested in the Downing Private Placements.

208.    Defendants Giffin, Robbie, Grumbine, Haufler, Auda and Zenati continued to support and spread the representations and/or omissions while Plaintiffs were employed at Downing.

40

209.    As a result of Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati position as officers, owners and/or directors of Downing, they had a "special relationship" to Plaintiffs.

210.    Plaintiffs were justified in relying upon Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati's representations.

211.    As a direct and proximate consequence of Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati's representations or omissions, Plaintiffs suffered damages in an amount to be determined at trial, but not less than $2,091,566.04.

212.    Moreover, because Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati's conduct was grossly negligent and malicious, Plaintiffs are entitled to punitive damages in an amount to be determined at trial, but in no event less than $6,000,000.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Violation of Federal Securities Laws)

213.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 212 of this Complaint as if set forth at length herein.

214.    Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice Giroux and Pulver made numerous material misrepresentations and omissions to Plaintiffs concerning the Downing Private Placements in violation of federal securities laws.

215.    Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful

for any person, directly or indirectly, by the use of any means or instrumentality of

interstate commerce or of the mails, or of any facility of any national securities exchange

to use or employ, in connection with the purchase or sale of any security, any

manipulative or deceptive device or contrivance in contravention of such rules and

regulations as the Securities and Exchange Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors. *See* U.S.C. § 78j. The

SEC, pursuant to 15 U.S.C. § 78j, promulgated S.E.C. Rule 10b-5 (codified at 17 C.F.R.

§ 240.10b-5).

216.    Rule 10b-5 makes it unlawful to: (1) employ any device, scheme, or

artifice to defraud; (2) to make any untrue statement of a material fact or to not state a

material fact necessary in order to make the statements made, in the light of the

circumstance under which they were made, not misleading; or (3) to engage in any act,

practice, or course of business which operate or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any securities. *See* 17 C.F.R. §

240.10b-5.

217.    As alleged above, Defendants Downing, Wagner, Shaut, Buckingham,

Lawrence, Pila, Rice, Giroux and Pulver engaged in deceptive conduct in connection

with a securities transaction in violation of 15 U.S.C. § 78j, by making numerous material

misrepresentations and omissions concerning the Downing Private Placements.

218.    In reliance on the foregoing misrepresentations and material omissions by

Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and

42

Pulver, Plaintiffs were induced to invest $250,000 each in the Downing Private Placements.

219.    As a result of their unlawful conduct, Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver willfully violated Section 10(b) of the Exchange Act and Exchange Act 10b-5, and are liable to Plaintiffs in excess of $1,000,000, with an exact amount to be determined at trial.

220.    As a direct and proximate result of Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver's unlawful conduct, Plaintiffs were damaged in the amount of at least $1,000,000, with an exact amount to be determined at trial.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment)

221.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 220 of this Complaint as if set forth at length herein.

222.    As a result of the conduct described herein, Defendant Downing have been unjustly enriched at the expense of Plaintiffs.

223.     Defendant Downing received a benefit by retaining Plaintiffs wages and expenses due and owing to Plaintiffs, and received Plaintiffs investments in the Downing Private Placements.

224.    Retention of these benefits by Defendant Downing would be unjust and inequitable.

225.    Because it would be unjust and inequitable for Defendant Downing to retain such benefits, Plaintiffs are entitled to restitution of all monies unjustly and inequitably retained.

226.    By reason of the foregoing, Plaintiffs are entitled to a judgment against Defendant Downing, in an amount to be determined at trial, but in no event less than $2,091,566.04.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### (In The Alternative – Breach of Contract – Downing Note)

227.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 226 of this Complaint as if set forth at length herein.

228.    In the alternative to the first cause of action, Plaintiff Miller seeks to enforce the Downing Note.

229.    On December 7, 2015, Plaintiff Miller entered into an agreement, titled "General Release," with Defendants Downing Investment Partners, LP, Downing Partners, LLC and IVC Healthcom, LLC whereby said entities agreed to issue Plaintiff Miller a promissory note in the amount of $250,000, plus 8% interest, to repurchase his ownership interest in the Downing Private Placement (the "Downing Note").

230.    The Downing Note provided for twenty-four (24) equal monthly installments of $11,307 each, commencing on March 30, 2016, and was signed by Defendant Shaut, on behalf of Defendant IVC.

231.    The Downing Note further provided that "[i]n the event that IVC should fail to make any payment due in accordance with the forgoing payment schedule within ten (10) business days of the due date, IVC shall be in default, and Miller shall have the option, in his sole discretion, to immediately accelerate the Promissory Note and the full outstanding balance shall be immediately due and payable without demand or notice whatsoever."

232.     To date, Defendants have failed to make a single payment pursuant to the Downing Note.

233.     As a result of same, Defendants Downing Investment Partners, LP, Downing Partners, LLC and IVC are in breach of the General Release and Downing Note.

234.     As a result of same, Plaintiff Miller has been damaged in the amount of $271,368, with an exact amount to be determined at trial.

***

**WHEREFORE**, Plaintiffs David Kiderman, David Hilderbrand, Ryan Detzel and Mark Miller respectfully demand judgment as follows:

A.     On the First Cause of Action, in favor of Plaintiff Miller and against Defendants Downing Investment Partners, LP, Downing Partners, LLC and IVC, for a judgment declaring the General Release and Downing Note to be void and of no force and effect for fraud in the inducement;

B.     On the Second Cause of Action, in favor of Plaintiffs and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giroux, Giffin, Robbie, Haufler, and Auda, jointly and severally, in an amount to be determined at trial, but in no event less than $436,626.04, liquidated damages in an additional amount of at least $436,626.04, reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b);

C.     On the Third Cause of Action, in favor of Plaintiff David Kiderman and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda, jointly and severally, for unpaid wages, together with

interest thereon, reasonable attorneys' fees, costs and additional equal amount of liquidated damages pursuant § 198 of NYLL;

D.      On the Fourth Cause of Action, in favor of Plaintiff Ryan Detzel and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Robbie, Haufler, and Auda, jointly and severally, for unpaid wages, together with interest thereon, reasonable attorneys' fees, costs and liquidated damages pursuant § 4113.15 of OPAA;

E.      On the Fifth Cause of Action, in favor of Plaintiff Hilderbrand and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, and Auda, jointly and severally, for unpaid wages, together with interest thereon, reasonable attorneys' fees, costs, and additional waiting time penalties pursuant § 203 of the California Labor Code;

F.      On the Sixth Cause of Action, in favor of Plaintiff Hilderbrand and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giffin, Robbie, Haufler, and Auda, jointly and severally, for expenses due, together with interest thereon, reasonable attorneys' fees, and costs pursuant to § 2802 of the California Labor Code;

G.      On the Seventh Cause of Action, in favor of Plaintiff Miller and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giroux, Giffin, Robbie, Haufler, and Auda, jointly and severally, for unpaid wages, together with interest thereon, reasonable attorneys' fees, costs, and additional waiting time penalties pursuant § 203 of the California Labor Code;

H.      On the Eighth Cause of Action, in favor of Plaintiff Miller and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Rice, Giroux, Giffin,

Robbie, Haufler, and Auda, jointly and severally, for expenses due, together with interest thereon, reasonable attorneys' fees, and costs pursuant to § 2802 of the California Labor Code;

I.      On the Ninth Cause of Action, in favor of Plaintiffs and against Defendant Downing, jointly and severally, in an amount of damages not less than $2,091,566.04, with an exact amount to be determined at trial;

J.      On the Tenth Cause of Action, in favor of Plaintiffs and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and Pulver, jointly and severally, in an amount of damages not less than $2,091,566.04, plus punitive damages not less than $6,000,000, with exact amounts to be determined at trial;

K.      On the Eleventh Cause of Action, in favor of Plaintiffs and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati, jointly and severally, in an amount of damages not less than $2,091,566.04, plus punitive damages not less than $6,000,000, with exact amounts to be determined at trial;

L.      On the Twelfth Cause of Action, in favor of Plaintiffs and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Pulver, Giffin, Giroux, Robbie, Grumbine, Haufler, Auda and Zenati, jointly and severally, in an amount of damages not less than $2,091,566.04, plus punitive damages not less than $6,000,000, with exact amounts to be determined at trial;

M.      On the Thirteenth Cause of Action, in favor of Plaintiffs and against Defendants Downing, Wagner, Shaut, Buckingham, Lawrence, Pila, Rice, Giroux and

Pulver, jointly and severally, in an amount of damages not less than $1,000,000, with an exact amount to be determined at trial;

N.      On the Fourteenth Cause of Action, in favor of Plaintiffs and against Defendant Downing, jointly and severally, in an amount of damages not less than $2,091,566.04, with an exact amount to be determined at trial;

O.      On the Fifteenth Cause of Action, in the alternative, in favor of Plaintiff Miller and against Defendants Downing Investment Partners, LP, Downing Partners, LP, and IVC, jointly and severally, in an amount of damages not less than $271,368, with an exact amount to be determined at trial;

P.      For punitive damages of not less than $6,000,000, with an exact amount to be proven at trial;

Q.      For consequential damages, liquidated damages, attorneys' fees, pre- and post-judgment interest and costs of this action;

R.      Together with such other relief in Plaintiffs' favor as this Court deems just and proper.

Dated: New York, New York
      June 30, 2016

CARMEL, MILAZZO & DICHIARA LLP

By:
        Ross D. Carmel, Esq.
        Christopher P. Milazzo, Esq.
261 Madison Avenue, 9th Floor
New York, New York 10016
(646) 838-1310

*Attorneys for Plaintiffs David Kiderman, David Hilderbrand, Ryan Detzel and Mark Miller*