UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

DAVID HILDERBRAND, DAVID KIDERMAN   :     Case No.: 16-cv-04040
RYAN DETZEL, and MARK MILLER,          :

                           :

         Plaintiffs,            :

                           :

    -against-              :

                           :

DOWNING INVESTMENT PARTNERS, LP,   :
DOWNING PARTNERS, LLC,          :
3SI SYSTEMS, LLC, IVC HEALTHCOM, LLC,  :
DAVID W. WAGNER, MICHAEL H. SHAUT,  :
GREG AUDA, RICHARD BUCKINGHAM,   :
JEFF RICE, MARC M. LAWRENCE,     :
MICHAEL GRUMBINE, BRETT GIFFIN,   :
MARCO ZENATI, GEORGE ROBBIE,     :
and GLENN HAUFLER,           :

                           :

           Defendants.     :

-------------------------------------------------------------x

**PLAINTIFFS DAVID HILDERBRAND, DAVID KIDERMAN, RYAN DETZEL, AND MARK MILLER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR AN ORDER OF ATTACHMENT, PRELIMINARY INJUNCTION, AND A TEMPORARY RESTRAINING ORDER**

CARMEL, MILAZZO & DICHIARA, LLP
261 Madison Avenue, 9th Floor
New York, New York 10016
(212) 658-0458

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES…………………………………………………………....ii

Preliminary Statement……………….......………………………………………....1

Statement of Facts……………………………………………………………………2

Argument………………………………………………………………………………9

I.      THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR AN
ORDER OF ATTACHMENT……………………...………….....................................9

        A.     Plaintiffs' State Claims for A Money Judgment and the Amount
Demanded Exceeds All Known Counterclaims..……………………….11

        B.     Grounds For Order of Attachment Under CPLR § 6201………………..11

            1.   Defendants Have Acted With the Intent to Defraud Creditors
and/or Frustrate the Enforcement of Any Judgment……………..11

            2.   The Majority of Defendants are Non-Domiciliaries…………….....14

        C.     It is Probable That Plaintiffs Will Succeed On the
Merits…………………………...………………………………………15

            1.   Breach of Contract………………………………………………...15

            2.   Fraud………………………………………………………………16

            3.   Violation of the FLSA……………………………………………19

II.     THE COURT SHOULD GRANT PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION……………………...................21

        A.     Plaintiffs Are Likely To Succeed On the Merits
of Their Claims……………………………………………...……………22

        B.     Plaintiffs Will Be Irreparably Harmed
Absent a Preliminary Injunction…………………………………………22

        C.     A Balancing of the Equities Weighs Decidedly
In Plaintiffs' Favor………………………………………………………23

III.   THE COURT SHOULD ISSUE A TEMPORARY
        RESTRAINING ORDER.....................................................................................24

Conclusion…………………………………………………………………………………25

## TABLE OF AUTHORITIES

**CASES**                                                                            **PAGE**

*Abdul Wali v. Coughlin,*
754 F.2d 1015 (2d Cir.1985)…………………………………………………...……..21

*Ayyash v. Bank Al-Madina,*
233 F.R.D. 325 (S.D.N.Y. 2005)………………………………………………………15

*Azru v. Azru,*
190 A.D.2d 87, 91, 597 N.Y.S.2d 322 (1st Dep't 1993)………………………...……10

*Bank of China v. NMB L.L.C.,*
 192 F. Supp. 2d 183 (S.D.N.Y. 2002)……………………………………...........10, 13

*Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
910 F.2d 1049 (2d Cir.1990)…………………………………………………..22

*Brock v. Superior Care, Inc.,*
840 F.2d 1054 (2d Cir.1988)………………………………………..…………20

*Cargill, Inc. v. Sabine Trading & Shipping Co.,*
756 F.2d 224 (2d Cir.1985)…………………………………………………....14

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010)…………………………………...……………………22

*Considar, Inc. v. Redi Corp. Estab.,*
 655 N.Y.S.2d 40, 41, 238 A.D.2d 111 (App. Div. 1997)……………………………15

*Costal Aviation, Inc. v. Commander Aircraft Co.,*
 937 F. Supp. 1051 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2nd Cir. 1997)………………...…15

*Cumberland Oil Corp. v. Thropp,*
791 F.2d 1037 (2d Cir. 1986)………………………………………………………17

*Davila Pena v. Morgan,*
 149 F. Supp. 91 (S.D.N.Y. 2001)………………………………..…………………14, 15

*Echo Design Group, Inc. v. Zino Davidoff S.A.,*
283 F.Supp.2d 963 (S.D.N.Y. 2003)………………………………………………25

*Heldman v. United States*,
354 F.Supp. 1241 (S.D.N.Y. 1973)..............................................................................24

*Herman v. RSR Sec. Servs. Ltd.*,
172 F.3d 132 (2d Cir.1999)........................................................................................19

*ITC Entm't, Ltd. v. Nelson Film Partners*,
714 F.2d 217 (2d Cir. 1983)..............................................................................10, 13

*JSC Foreign Econ. Ass'n. Technostroyexport v. Int'l Dev. and Trade Serv., Inc.*,
306 F.Supp.2d 482 (S.D.N.Y. 2004).........................................................................11

*King County, Wash. v. IKB Deutsche Industriebank AG*,
916 F.Supp.2d 442 (S.D.N.Y. 2013)...................................................................17

*Koehler v. Bank of Bermuda, Ltd.*,
12 N.Y.3d 533, 539, 911 N.E.2d 825, 829, 883N.Y.S.2d 763 (2009)...............................14

*Main Street Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*,
103 F.Supp.3d 244, 253 (N.D.N.Y.2015).................................................................22

*Marblegate Asset Management v. Education Management Corp.*,
75 F.Supp.3d 592 (S.D.N.Y. 2014) ...................................................................22

*Meridien Int'l Bank Ltd. v. Gov't of Rep. of Liber.*,
No. 92 Civ 7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan. 22, 1996) ...................10, 13

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010)........................................................................21

*Mineola Ford Sales Ltd. v. Rapp*,
242 A.D.2d 371, 271, 661 N.Y.S.2d 281 (2d Dep't 1997).......................................12

*No Spray Coalition, Inc. v. City of New York*,
252 F.3d 148 (2d Cir. 2001).........................................................................21

*S.E.C. v. Princeton Econ. Int'l, Ltd.*,
73 F.Supp.2d 420 (S.D.N.Y.1999).................................................................22

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*,
190 F.Supp.2d 577 (S.D.N.Y. 2002).............................................................25

iii

*Van Brunt v. Rauschenberg,*
  799 F. Supp. 1467 (S.D.N.Y. 1992)……………………………………………………..15

## Statutes:

Fed. R. Civ. P. 64……………………………………………………………....…1, 9

Fed. R. Civ. P. 65………………………………………………………………….....1

N.Y. Civ. Prac. L. & R. § 6201 (McKinney 2015)……………………………………..9

N.Y. Civ. Prac. L. & R. 6201(1) (McKinney 2009)……………………………………13

N.Y. Civ. Prac. L. & R. § 6201(3) (McKinney 2015)…………………..…………..11, 12

N.Y. Civ. Prac. L. & R. 6212 (McKinney 2015)………………………………………..9

29 U.S.C. § 203(d) (1994)………………………………………………………19

Plaintiffs David Hilderbrand, David Kiderman, Ryan Detzel and Mark Miller (collectively, "Plaintiffs"), by and through their counsel, Carmel, Milazzo & DiChiara, LLP, respectfully submit this Memorandum of Law in support of their motion: (a) pursuant to Article 62 of the CPLR, and Fed. R. Civ. P. 64, for the issuance of an Order of Attachment against the property and assets of Defendants Downing Investment Partners LP ("DIP"), Downing Partners, LLC ("DP"), 3si Systems, LLC ("3si"), IVC Healthcom, LLC ("IVC") (collectively, "Downing"), David Wagner, Marc Lawrence, Michael Shaut and Richard Buckingham; and (b) pursuant to Fed. R. Civ. P. 65, for a preliminary injunction, restraining and enjoining Defendants Wagner, Lawrence, Shaut, Buckingham, DIP, DP, 3si, and IVC from, *inter alia*, selling, transferring, assigning, encumbering, dissipating or otherwise disposing of any assets, money or property of Defendants DIP, DP, 3si, and IVC (as fully set forth in the Order to Show Cause). This Memorandum of Law is also submitted in support of Plaintiffs' application for a temporary restraining order.

## **Preliminary Statement**

This action arises out of an outright fraud and Ponzi scheme perpetrated by Defendants. As discussed below, Defendants, who include non-domiciliaries of New York with insufficient assets to satisfy a judgment against them, have already taken steps to assign or transfer or have assigned their interests/assets with the intent of frustrating any judgment issued in Plaintiffs' favor.

Defendants Wagner, Lawrence, Shaut and Buckingham have stripped Defendants IVC, DIP, and DP of their assets, including 3si, and transferred anything of value to new entities, CliniFlow Technologies, LLC ("CliniFlow") and/or Hanover Square Capital Partners, LP ("Hanover"). Prior to transferring 3si, Defendant Wagner authorized loans in the total amount of

$481,000 from Defendant IVC to Defendant 3si.  Further, and even more appalling, Defendant Wagner liquidated partnership units in DIP which were owned by his family trusts, and as result, his family trusts received a payout of $450,000.00 from DIP.

Defendants continue to engage in such wrongful conduct, and if left unchecked, their continued wrongful conduct will likely result in the demise of DIP, DP, 3si and IVC.  As such, the Court should issue a prejudgment Order of Attachment on the assets of Defendants DIP, DP, 3si, IVC, Wagner, Lawrence, Shaut and Buckingham.

In addition, the Court should grant a preliminary injunction to preserve the *status quo* during the pendency of this action.  Indeed, in the absence of a preliminary injunction, Defendants will continue to loot DIP, DP, 3si and IVC, entirely stripping them of all their assets, rendering any judgment herein meaningless.

<u>**Statement of Facts**</u>

**<u>Plaintiff Detzel</u>**

In January 2015, Plaintiff Detzel met with Defendant Shaut in Shaker Heights, Ohio regarding his potential employment with Downing.  (Affidavit of Plaintiff Detzel, sworn to November 14, 2016) ("Detzel Aff.") ¶ 3.)  During this meeting, Defendant Shaut explained that Downing's products have been commercialized, were generating revenue, and that Plaintiff Detzel's commissions would be uncapped.  (*Id.* ¶ 4.)  Defendant Shaut further represented that 3si had five beta sites up and running, and they were being used in a clinical setting.  (*Id.* ¶ 6.)  On January 25, 2016, Mr. Pulver, copying Defendant Shaut, sent Plaintiff Detzel an email which included an offer letter and a Private Placement Memorandum ("PPM") for the investment into Downing Digital Healthcare Group, LLC, n/k/a Defendant 3si.  (*Id.* ¶ 7.)  According to the PPM, the "Use of Proceeds" is to "fund the standard operations of the Company and to support new

investment requirements from the portfolio companies." (*Id.* at Ex. A. pg. 11.)  Further, the PPM

represents that the "3si Hub, commercializing in January 2015." (*Id.* at Ex. A. pg. 36.)  In

addition, according to the PPM, under "Company Milestones," in the fourth quarter of 2014, 3si

was in "Phase I Commercialization of betas" and was in "Phase II Commercialization" in the

first quarter of 2015. (*Id.* Ex. A. pg. 42.)  Further, the PPM indicates that 3si had "38 active

contract discussions" and "5 betas." (*Id.* at Ex. A. pg. 43.)  Finally, the last slide states "Thank

you" from Defendants Wagner and Shaut. (*Id.* at Ex. A. pg. 46.)   Based on the foregoing, on

January 26, 2015, Plaintiff Detzel accepted an offer of employment with Downing. (*Id.* ¶ 8.)

According to his employment agreement, Plaintiff Detzel was entitled to, *inter alia*, a base

compensation of one hundred fifty thousand dollars ($150,000) per annum, commissions of 5%

of all sales for all portfolio companies in his region, with no cap on his commission earnings,

reimbursement of expenses, and Downing would cover his healthcare expenses. (*See id.* at Ex.

B. ¶ 3.)  In addition, he was required to make an investment of two hundred fifty thousand

dollars ($250,000) into 3si, by February 1, 2015, or the employment offer would be rescinded.

(*See id.* at Ex. B. ¶ 3.)  On or about February 5, 2015, Plaintiff Detzel invested $250,000 into 3si.

(*Id.* ¶ 9.)

**Plaintiff Kiderman**

On or about February 27, 2015, Plaintiff Kiderman had a meeting with Defendant Shaut

in Shaker Heights, Ohio regarding his potential employment with Downing. (Affidavit of

Plaintiff Kiderman, sworn to November 14, 2016) ("Kiderman Aff.") ¶ 3.)  During this meeting,

Defendant Shaut explained that Downing's products have been commercialized, were generating

revenue, and that Plaintiff Kiderman's potential commissions would be uncapped. (*Id.* ¶ 4.)

Defendant Shaut further represented that 3si had five (5) beta sites up and running, and they were

being used in a clinical setting.  (*Id.* ¶ 6.)  In or about March 2015, Plaintiff Kiderman received a PPM for his investment into Downing Health Technologies n/k/a 3si.  (*Id.* ¶ 7.)  According to the PPM, the "Use of Proceeds" is to "fund the standard operations of the Company and to support new investment requirements from the portfolio companies."  (*Id.* at Ex. A. pg. 11.)  Further, the PPM represented that 3si is a "Commercial stage healthcare company…" and "3si Hub, commercializing in January 2015."  (*Id.* at Ex. A. pgs. 36-37.)  In addition, under "Company Milestones," in the fourth quarter of 2014, 3si was in "Phase I Commercialization of betas" and was in "Phase II Commercialization" in the first quarter of 2015.  (*Id.* at Ex. A. pg. 47.)  Further, the PPM indicates that 3si had "38 active contract discussions" and "5 betas."  (*Id.* at Ex. A. pg. 48.)  Based on the foregoing, on March 7, 2015, Plaintiff Kiderman accepted an offer of employment with Downing.  (*Id.* ¶ 8.)  According to his employment agreement, Plaintiff Kiderman was entitled to, *inter alia*, a base compensation of one hundred forty five thousand dollars ($145,000) per annum, commissions of 5% of all sales for all portfolio companies in his region, with no cap on his commission earnings, reimbursement of expenses, and Downing would cover his healthcare expenses.  (*See id.* at Ex. B. ¶ 3.)  In addition, he was required to make an investment of two hundred fifty thousand dollars ($250,000) into 3si, by March 23, 2015, or the employment offer would be rescinded.  (*See id.* at Ex. B. ¶ 6.)  Thereafter, Plaintiff Kiderman invested $250,000 into 3si.  (*Id.* ¶ 9.)

**<u>Plaintiff Miller</u>**

On May 4, 2015, Plaintiff Miller flew to Philadelphia, Pennsylvania for an in-person interview with former IVC President Paul Giroux, and former Downing employee Doug Regula to discuss joining IVC.  (Affidavit of Plaintiff Miller, sworn to November 11, 2016) ("Miller Aff.") ¶ 3.)  During this meeting, Mr. Giroux pitched the opportunity as a chance to work for,

and invest in, a venture capital company (*i.e.* Downing).  (*Id.* ¶ 4.)  Mr. Giroux represented that Downing and IVC were cash positive, and IVC had approximately twelve (12) months of working capital in order to fund the company moving forward.  (*Id.* ¶ 5.)  Mr. Giroux represented that IVC had previously received $2,500,000 in investments in order to fund the company, and that Defendant Wagner committed to investing $1,500,000 into IVC beginning in July 2015.  (*Id.* ¶ 6.)  On or about May 11, 2015, Plaintiff Miller received an offer letter and PPM from Defendants for his investment into IVC. (*Id.* ¶ 7.)  According to the PPM, IVC had received a $1.5 million investment from Downing Partners.  (*See id.* at Ex. A at pg. 53.)  On May 11, 2015, Plaintiff Miller accepted an offer of employment with IVC.  (Miller Aff. ¶ 8.)  According to Plaintiff Miller's employment letter, he was entitled to, *inter alia*, a base compensation of one hundred seventy five thousand dollars ($175,000) per annum, a cash bonus of 30% of his base compensation, reimbursement of expenses, and Downing would cover his health expenses.  (*See id.* at Ex. B ¶ 4.)  In addition, Plaintiff Miller was required to make an investment of two hundred fifty thousand dollars ($250,000) into IVC, by May 29, 2015, or the employment offer would be rescinded.  (*See id.* at Ex. B ¶ 4C.)  Thereafter, Plaintiff Miller invested $250,000 into IVC.  (*Id.* Aff. ¶ 9.)

**Plaintiff Hilderbrand**

On or about May 4, 2015, Plaintiff Hilderbrand participated in a Skype call with former President of 3si regarding potential employment with Downing. (Affidavit of Plaintiff Hilderbrand, sworn to November 11, 2016) ("Hilderbrand Aff.") ¶ 3.)  On May 5, 2015, Plaintiff Hilderbrand received a PowerPoint presentation from Mr. Pila titled "3si Executive Overview." (*Id.* ¶ 4.)  According to the 3si Executive Overview, 3si had its "Beta Client Launch" in the first quarter of 2015.  (*See id.* at Ex. A at pg. 30.)  In addition, the 3si Executive Overview states that

3si's commercial sales programed commenced on May 1, 2015, and lists its "Beta" participants as the University of Virginia Medical Center, St. Luke's in Bethlehem, PA, VA in Boston, and Leeds and Central Manchester in the UK. (*See id.* at Ex. A at pg. 31.) On May 14, 2015, Plaintiff Hilderbrand received an email from a recruiter working for Downing, which contained another PowerPoint presentation. (*Id.* ¶ 5.) According to this presentation, 3si had five beta sites, 38 active contract discussions in the U.S. and United Kingdom, and $5 million plus in its pipeline described as annual contract value. (*See id.* at Ex. B at pg. 23.) Further, Phase I Commercialization – Betas occurred in the fourth quarter of 2014, and Phase II Commercialization – Full Market Launch occurred in the first quarter of 2015. (*See id.* at Ex. B at pg. 23.) On May 22, 2015, Plaintiff Hilderbrand met with Defendant Lawrence in Las Vegas, Nevada. (*Id.* ¶ 6.) During this meeting, Defendant Lawrence represented, *inter alia*, that 3si had five beta sites up and running, they were being used in a clinical setting, and that Downing had millions of dollars of cash on hand in order to fund the business. (*Id.* ¶ 7.) On May 28, 2015, Plaintiff Hilderbrand accepted an offer of employment with Downing. (*Id.* ¶ 8.) According to Plaintiff Hilderbrand's written employment letter, he was entitled to, *inter alia*, a base compensation of one hundred eighty five thousand dollars ($185,000) per annum, a stretch bonus of twenty thousand dollars ($20,000) for exceeding the annual sales plan by ten percent (10%) or more, reimbursement of expenses, and Downing would cover his healthcare expenses. (*See id.* at Ex. C ¶¶ 3, 4 and 9.) In addition, Plaintiff Hilderbrand was required to make an investment of two hundred fifty thousand dollars ($250,000) into 3si, by June 5, 2015, or the employment offer would be rescinded. (*See id.* at Ex. C ¶ 5.) Thereafter, Plaintiff Hilderbrand invested $250,000 into 3si. (*Id.* ¶ 9.)

**Plaintiffs Commence Their Employment and Discover the Fraud**

After Plaintiffs Detzel, Kiderman and Hilderbrand commenced their employment, they learned that there were no viable products to sell, and thus, no way to earn the commissions or bonuses set forth in their respective employment agreements. (*See* Detzel Aff. ¶ 10, Kiderman Aff. ¶ 10, and Hilderbrand Aff. ¶ 10.)  Downing failed to pay Plaintiffs Detzel and Hilderbrand their first paychecks due after commencing their employment. (*See* Detzel Aff. ¶ 11, and Hilderbrand Aff. ¶ 11.)  Defendants failed to pay Plaintiff Kiderman one of his first two paychecks due after commencing his employment.  (*See* Kiderman Aff. ¶ 11.)

On or about June 16, 2015, approximately two weeks after Plaintiff Hilderbrand joined, Defendant Grumbine advised Plaintiff Hilderbrand that several employees had not been paid. (*See* Hilderbrand Aff. ¶ 13.)  Plaintiff Hilderbrand, shocked by this statement, turned to Defendant Lawrence and asked him if it was true and why Defendant Lawrence did not disclose this to him during his recruitment and before his investment.  (*See* Hilderbrand Aff. ¶ 14.) Defendant Lawrence incredibly responded by stating "you did not ask and be quiet because other people are around." (*Id.* ¶ 14.)  On or about September 29, 2015, Plaintiffs discovered that Downing had failed to pay for their health insurance, and that they had not been insured since July 31, 2015.  (*See* Detzel Aff. ¶ 12, Kiderman Aff. ¶ 12, Hilderbrand Aff. ¶ 15, and Miller Aff. ¶ 12.)  On or about September 15 2015, Defendant IVC ceased paying Plaintiff Miller his wages. (Miller Aff. ¶ 11.)  Also at this time, Plaintiff Miller learned that DIP never made the $1.5 million investment into IVC as set forth in the PPM.  (*See* Miller Aff. ¶ 13.)  On October 26, 2015, Plaintiff Detzel met with Defendant Shaut at a local Starbucks regarding his failure to receive salary and reimbursement of expenses.  (*See* Detzel Aff. ¶ 13.)

After Plaintiff Detzel complained about not receiving his salary/expenses, Defendant Shaut stated that if [Detzel] would have asked him if people were being paid at the time [he

entered into the employment agreement with Downing], he would have said no.  (*See* Detzel Aff. ¶ 13.)  On December 4, 2015, Plaintiff Miller resigned from IVC.  (*See* Miller Aff. ¶ 14.)  As of Plaintiff Miller's resignation, he was due $49,041.39 in wages and expenses.  (*Id.* ¶ 15.)  In or about March 2016, Plaintiffs Kiderman, Detzel and Hilderbrand resigned from Downing.  (*See* Detzel Aff. ¶ 14, Kiderman Aff. ¶ 13, and Hilderbrand Aff. ¶ 16.)  At the time of Plaintiff Kiderman's resignation, he was due $102,350.10 in wages and expenses.  (*See* Kiderman Aff. ¶ 14.)  At the time of Plaintiff Detzel's resignation, he was due $120,815.00 in wages and expenses.  (*See* Detzel Aff. ¶ 15.)  At the time of Plaintiff Hilderbrand's resignation, he was due $164,359.55 in wages and expenses.  (*See* Hilderbrand Aff. ¶ 17.)

**<u>Defendants Have Disposed of and Secreted Property</u>**

Plaintiffs have discovered that Defendant 3si is no longer owned or controlled by Defendants DIP or DP.  (*See* Carmel Aff. Ex. D.)   Rather, 3si is now owned and controlled by CliniFlow Technologies, LLC ("CliniFlow") and Hanover Square Capital Partners, LP ("Hanover"), which are owned and controlled by Defendants Wagner, Lawrence and Buckingham.  (*See* Carmel Aff. at Ex. E, Ex. F and Ex. G.)  Upon information and belief, DIP and DP, have been stripped of their assets and anything of value was transferred to CliniFlow and/or Hanover.  (*See* Carmel Aff. at Ex. D.)

Further, Plaintiffs have learned that Defendant Wagner liquidated partnership units in Defendant DIP owned by his family trusts.  (*See* Carmel Aff. at Ex. C, pg. 4.)  The result was $450,000.00 leaving DIP, and going to Defendant Wagner's family trust.  (*See id.* at Ex. C, pg. 4.)  Defendant Wagner has also used DIP funds for personal expenses and transferred funds to his wife, who has no involvement in Downing.  (*See id.* at Ex. C, pg. 4.)  In addition, in 2014, DIP reported a loss of $5,249,593.00, while at the same time paying Defendant Wagner

- 8 -

$792,042.00 in compensation.  (*See id.* at Ex. C, pg. 6.)  During the same period, and notably directly prior to Plaintiffs joining Downing, many Downing employees were not paid for months.  (*See id.* at Ex. C, pg. 6.)

Defendant Wagner further authorized loans in the total amount of $481,000 from Defendant IVC to Defendant 3si, effectively stripping IVC of its assets.  (*See id.* at Ex. B at ¶ 28.)

Finally, Defendant Wagner is listed on the State of Rhode Island, Division of Taxation's website as a "Top 100 Income Tax Delinquent" owing $96,400.69 in back taxes.  (*See id.* at Ex. H, pg. 2.)

## **Argument**

## **POINT I**

### **THE COURT SHOULD GRANT PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT**

Pursuant Rule 64 of the Fed. R. Civ. P., the issuance of a prejudgment Order of Attachment is governed under the law of the state where the Court is located.  In this instance, New York State.  The Court should grant a prejudgment Order of Attachment upon property of Defendants DIP, DP, 3si, IVC, Wagner, Lawrence, Shaut and Buckingham, pursuant to CPLR §§ 6201 and 6212.  CPLR § 6201 provides, in pertinent part, that:

> An order of attachment may granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more of defendants, when:
>
> 1.      the defendant is a non-domiciliary residing out of state…; or
>
> 3.      the defendant, with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state, or is about to do any of these acts; . . .

- 9 -

N.Y. Civ. Prac. L. & R. § 6201 (McKinney 2015). CPLR § 6212 requires the proponent of a

motion for an attachment to establish the following:

> that there is a cause of action, that it is probable that plaintiff will
> succeed on the merits, **that one or more** of the grounds for attachment
> provided in section 6201 exist, and that the amount demanded from the
> defendant exceeds all counterclaims known to the plaintiff.

N.Y. Civ. Prac. L. & R. § 6212 (McKinney 2015) (emphasis added).

Accordingly, an attachment may be granted where: (1) the defendant, with the intent to

defraud creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's

favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state,

or is about to do any of these acts; (2) a cause of action for a money judgment exists; (3) that it is

probable that the plaintiff will succeed on the merits of its claim; and (4) the amount demanded

from the defendant exceeds all known counterclaims. *See id.*; *Azru v. Azru*, 190 A.D.2d 87, 91,

597 N.Y.S.2d 322, 325 (1st Dep't 1993). Courts have additionally required that a plaintiff show

that there is "something, whether it is a defendant's financial position or past and present conduct

[that] poses a real risk of the enforcement of a future judgment." *Bank of China v. NMB L.L.C.*,

192 F. Supp. 2d 183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Rep. of

Liber.*, No. 92 Civ. 7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan. 22, 1996) (citations omitted));

see also, e.g., *ITC Entm't, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir. 1983)

(reversing order vacating attachment in aid of security where the defendant had insufficient

assets in New York).

As discussed more fully below, Plaintiffs demonstrate each of the required elements for

the grant of an order of attachment, which Plaintiffs seeks to secure any judgment that is entered

in this action. In addition, Defendants 3si, IVC, Wagner, Lawrence, Shaut, and Buckingham are

all non-domiciliaries residing out of New York State. Accordingly, the Court should grant

- 10 -

Plaintiffs' motion for an Order of Attachment with respect to Defendants DIP, DP, 3si, IVC, Wagner, Lawrence, Shaut and Buckingham's property.

### A. Plaintiffs State Claims For A Money Judgment and the Amount Demanded Exceeds All Known Counterclaims

Plaintiffs clearly state claims for a money judgment against Defendants in the Complaint. (*See* Compl. ¶¶ 138-238.)[1]

Plaintiffs are neither aware of any counterclaims nor have Defendants asserted any counterclaims. *JSC Foreign Econ. Ass'n. Technostroyexport v. Int'l Dev. and Trade Serv., Inc.*, 306 F.Supp.2d 482, 485 (S.D.N.Y. 2004) ("Because the defendants have not set forth any counterclaims in the papers before the Court, the amount demanded from the defendants exceeds the amount of all counterclaims known to the plaintiff.")

Therefore, Plaintiffs have made a satisfactory showing that there is a cause of action present for money damages, and the amount of damages exceeds that of any known counterclaims. As a result, Plaintiffs have met their burden of establishing the fourth element for the issuance of an order of attachment.

### B. Grounds For Order of Attachment Under CPLR § 6201

#### 1. Defendants Have Acted With the Intent to Defraud Creditors and/or Frustrate the Enforcement of any Judgment

As discussed above, in order to establish entitlement to an attachment under CPLR Article 62, a movant must establish *one of the grounds* set forth in CPLR § 6201. In this instance, Plaintiffs can establish both grounds set forth in CPLR § 6201. CPLR § 6201(3) provides that an order of attachment may be issued where the defendant, with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in

---

[1] The Complaint is annexed to the Carmel Aff. as Exhibit A.

plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state, or is about to do any of these acts. *See* N.Y. Civ. Prac. L. & R. § 6201(3) (McKinney 2015).

It is well established that an order of attachment may properly be issued under CPLR § 6201(3) where the plaintiff demonstrates that the defendant is about to conceal his or her property in one of the enumerate ways, or has acted with the intent to frustrate the enforcement of any judgment that may be rendered in the action. *See Mineola Ford Sales Ltd. v. Rapp*, 242 A.D.2d 371, 271, 661 N.Y.S.2d 281, 282 (2d Dep't 1997). In *Mineola Ford Sales*, the Court found that the plaintiff sufficiently demonstrated fraudulent intent to warrant the issuance of an order of attachment by establishing that while the defendant was an employee of the plaintiff, he falsified business records and diverted funds to his personal use. *Id.*

Here, Plaintiffs has sufficiently demonstrated that Defendant Wagner has diverted money from Defendants DIP and DP, in at least two ways. (*See* Carmel Aff. at Ex. C, pgs. 4 and 6.) First, Defendant Wagner liquidated partnership units in DIP, owned by his family trust, in the amount of $450,000.00, now lodged in the trust. (*Id.* at pg. 4.) Second, Defendant Wagner has used DIP funds for personal expenses and transferred funds to his wife, who has no involvement in Downing. (*Id.* at pg. 6.)

Next, Defendant 3si, a domiciliary of Massachusetts, is no longer under the umbrella of Downing, but a new entity CliniFlow. (*See* Carmel Aff. at Ex. D.) It is believed that 3si – the operating entity – has been transferred from Downing without consideration. Notably, as DP is the general partner of DIP, upon information and belief, Hanover is the general partner of CliniFlow. (*See* Carmel Aff. ¶¶ 15 and Ex. G.)

- 12 -

Defendant Wagner further authorized loans in the total amount of $481,000 from Defendant IVC to Defendant 3si, effectively stripping IVC of its assets.  (*See* Carmel Aff. at Ex. B. at ¶ 28.)

Courts have additionally required that a plaintiff show that there is "something, whether it is a defendant's financial position or past and present conduct [that] poses a real risk of the enforcement of a future judgment." *Bank of China v. NMB L.L.C.*, 192 F. Supp. 2d 183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Rep. of Liber.*, No. 92 Civ. 7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan. 22, 1996) (citations omitted)); see also, e.g., *ITC Entm't, Ltd v. Nelson Film Partners*, 714 F.2d 217, 221 (2d Cir. 1983) (reversing order vacating attachment in aid of security where the defendant had insufficient assets in New York).

Here, Defendant Wagner's financial position and past and present conduct poses a real risk of Plaintiffs' enforcing a future judgment.  Specifically, Defendant Wagner is listed on the State of Rhode Island, Division of Taxation's website as a "Top 100 Income Tax Delinquent" owing $96,400.69 in back taxes.  (*See* Carmel Aff. at Ex. H.)  Defendant DIP reported a loss of $5,249,593.00 in 2014, while at the same time paying Defendant Wagner $792,042.00 in compensation.  (*See* Carmel Aff. at Ex. C at pg. 6.)  It is believed that Defendant Wagner continues to drain funds from Downing.

Based upon the foregoing, Plaintiffs have sufficiently established that Defendants DIP, DP and Wagner have fraudulently diverted and concealed property and assets, with the intention of defrauding its creditors and frustrating any judgment rendered against it, and their past and present conduct poses a real risk of the enforcement of a future judgment.

### 2. The Majority of Defendants are Non-Domiciliaries

As discussed above, one of the grounds under CPLR 6201 for the granting of an order of attachment is where a defendant is a non-domiciliary of New York who does not reside in New York. *See* N.Y. Civ. Prac. L. & R. 6201(1) (McKinney 2009).

In the instant matter, it is undisputed that Defendants 3si, IVC, Wagner, Lawrence, Buckingham and Shaut are all non-domiciliaries residing out of New York State. (*See* Compl. ¶¶ 13, 14, 16-18, and 20.)

Further, there is no evidence to suggest that the non-domiciliary Defendants have sufficient assets in New York to satisfy a judgment under any of Plaintiffs' claims, including, but not limited to, breach of contract, fraud, the FLSA, and the state law claims (which have liquidated damages provisions). *See, e.g.*, *Davila Pena v. Morgan*, 149 F. Supp. 91, 93-94 (S.D.N.Y. 2001) (attachment proper where nondomiciliary defendant did not have sufficient New York assets to satisfy eventual judgment) (citing Ca*rgill, Inc. v. Sabine Trading & Shipping Co.*, 756 F.2d 224, 227 (2d Cir.1985)). In addition, the Court may compel a non-resident defendant to deliver out-of-state property into the State, to the Sheriff, so that such property may be attached. *See Koehler v. Bank of Bermuda, Ltd.*, 12 N.Y.3d 533, 539, 911 N.E.2d 825, 829, 883N.Y.S.2d 763, 767 (2009) (finding that under Article 52 of the CPLR, a garnishee may be required to transfer judgment debtor's property it holds out of state into New York).

Accordingly, Plaintiffs have established that Defendants 3si, IVC, Wagner, Lawrence, Buckingham and Shaut reside outside of New York, and therefore, are properly subject to an order of attachment under C.P.L.R. 6201(1).

### C.     It Is Probable That Plaintiff Will Succeed On The Merits

To show a likelihood of success on the merits for purposes of attachment, a plaintiff need only present facts sufficient to establish a prima facie case.  *See Considar, Inc. v. Redi Corp. Estab.*, 655 N.Y.S.2d 40, 41, 238 A.D.2d 111 (App. Div. 1997).  "[P]laintiff must be given the benefit of all legitimate inferences and deductions that can be made from the facts stated."  *Id.* (citation omitted); *Davila Pena v. Morgan*, 149 F. Supp. 91, 94 (S.D.N.Y. 2001) (the "more likely than not" standard of a preliminary injunction does not apply to attachment motion). Where, as here, "[t]here appears . . . to be a strong need for security for the enforcement of a[] judgment," a court should order attachment even if it finds both sides have "equal chances of success on the merits," or there is an "uncertainty of plaintiff's ultimate success."  *Pena*, 149 F. Supp. 2d at 94–95; *see also Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (granting attachment order even while noting "the difficulty of prevailing in civil RICO actions").

As demonstrated below, Plaintiffs are likely to succeed on the merits of each of their causes of action, which are addressed separately below.

### 1.     <u>Breach of Contract</u>

It is beyond cavil that Plaintiffs will succeed on their breach of contract claims.  To establish a claim for breach of contract claim; a plaintiff must prove the existence of a valid contract, performance of the contract by the plaintiff, breach of the contract by the defendant and damages suffered by the plaintiff.  *Costal Aviation, Inc. v. Commander Aircraft Co.,* 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2nd Cir. 1997).  *See also Van Brunt v. Rauschenberg*, 799 F. Supp. 1467, 1470 (S.D.N.Y. 1992).

In the instant matter, Plaintiffs entered into employment agreements with Defendants 3si and IVC, and fully performed under their agreements.  (*See* Detzel Aff. Ex. B, Kiderman Aff. Ex. B, Hilderbrand Aff. Ex. D, and Miller Aff. Ex. B.)  Under the terms of their respective employment agreements, Plaintiffs were entitled to, *inter alia*, salaries, health benefits, and reimbursement of expenses.  (*See* Detzel Aff. Ex. B, Kiderman Aff. Ex. B, Hilderbrand Aff. Ex. D, and Miller Aff. Ex. B.)  Defendant 3si failed to pay Plaintiff Detzel $120,815.00 in salary, expenses and health care costs pursuant to his employment agreement.  (*See* Detzel Aff. ¶ 15.) Defendant 3si failed to pay Plaintiff Kiderman $102,350.10 in salary, expenses and health care costs pursuant to his employment agreement.  (*See* Kiderman Aff. ¶ 14.)  Defendant 3si failed to pay Plaintiff Hilderbrand $164,359.55 in salary, expenses and health care costs pursuant to his employment agreement.  (*See* Hilderbrand Aff. ¶ 17.)  Defendant IVC failed to pay Plaintiff Miller $49,041.39 in salary, expenses and healthcare costs pursuant to his employment agreement.  (*See* Miller Aff. ¶ 15.)  As a result of the foregoing, Defendants 3si and IVC breached their contracts with Plaintiffs, and have Plaintiffs have been damaged.

Accordingly, Plaintiffs have established that it is probable they will succeed on the merits of their claim for breach of contract.

### 2.  <u>Fraud</u>

As demonstrated in Plaintiffs' Affidavits, and the documentary evidence submitted therewith, Plaintiffs are likely to succeed on their fraud claims.  Here, Plaintiffs have alleged that Defendants recruited Plaintiffs to be employees, entered into employment agreements which provided for a salary, commission, bonus, and expense reimbursement, and as a condition of their employment, required Plaintiffs to make a minimum investment of $250,000 each in a private placement for either Defendants 3si or IVC.  (*See* Compl. ¶ 1.)  As the private placement

investments were a requirement of Plaintiffs' employment, Defendants' representations

pertaining to Plaintiffs employment (*i.e.* salary, commissions, products, etc.) and the investments

are so intertwined as to constitute a single overarching fraud.

To recover damages for fraud, a plaintiff must prove: "(1) a misrepresentation or a

material omission of fact which was false and known to be false by defendant; (2) made for the

purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on

the misrepresentation or material omission; and (4) injury." *King County, Wash. v. IKB*

*Deutsche Industriebank AG*, 916 F.Supp.2d 442, 447 (S.D.N.Y. 2013).  The claim also requires a

showing of proximate causation, such that the injury "is the natural and probable consequence of

the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the

injury was a probable consequence of his fraud." *Cumberland Oil Corp. v. Thropp,* 791 F.2d

1037, 1044 (2d Cir. 1986).

Defendants represented that they would pay Plaintiffs a salary and would be able to earn

commissions and/or bonuses.  (*See* Detzel Aff. Ex. B, Kiderman Aff. Ex. B, Hilderbrand Aff. Ex.

C, and Miller Aff. Ex. B.)  At the time, Defendants made these representations they knew they

could not afford to pay Plaintiffs their salaries and omitted to tell Plaintiffs that they were not

paying or owed current employees past due compensation.  (*See* Carmel Aff. at Ex. B, ¶ 10, and

Ex. C, pg. 6.)  Defendants further represented that Defendant 3si had five beta sites up and

running, which were being used in a clinical setting.  (*See* Detzel Aff. ¶ 5, and Ex. A at pgs. 42-

43, Kiderman Aff. ¶ 6 and Ex. A at pgs. 47-47, and Hilderbrand Aff. ¶ 7, Ex. A at pgs. 30-34,

and Ex. B at pg. 23.)  Defendants still do not have a beta site up and running.  (*See* Carmel Aff.

at Ex. H, pg. 9, lines 22-23.)  These representations were made for the purpose of inducing

Plaintiffs to leave their current employers and accept employment with Defendants, and

Plaintiffs justifiably relied on these representations and accepted employment with Defendants. (*See* Detzel Aff. ¶ 8, Kiderman Aff. ¶ 8, Hilderbrand Aff. ¶ 8, and Miller Aff. ¶ 8.)  As a result, Plaintiffs have been injured by Defendants failure to pay them their compensation and reimbursement of expenses, as well as loss of their investments.  (*See* Detzel Aff. ¶¶ 9 and 15, Kiderman Aff. ¶ 9 and 14, Hilderbrand Aff. ¶¶ 9 and 17, and Miller Aff. ¶¶ 9 and 15.)

Further, Defendants made material misrepresentations contained directly in writing, including the Private Placement Memorandums, as well as numerous oral misrepresentations. Plaintiffs Detzel and Kiderman's PPM's each state that the "3si Hub [was] commercializing in January 2015." (*See* Detzel Aff. Ex. A. pg. 36, and Kiderman Aff. Ex. A. pg. 37.)  In addition, under "Company Milestones," in the fourth quarter of 2014, 3si was in "Phase I Commercialization of betas" and was in "Phase II Commercialization" in the first quarter of 2015. (*See* Detzel Aff. Ex. A. pg. 42, and Kiderman Aff. Ex. A. pg. 47.)  Further, their PPMs state that 3si had "38 active contract discussions" and "5 betas." (*See* Detzel Aff. at Ex. A. pg. 43, and Kiderman Aff. at Ex. A, pg. 48.)  Similarly, Plaintiff Hilderbrand received a 3si Executive Overview, which represents that 3si's Commercial Sales programed commenced on May 1, 2015, and lists its Beta participants as the University of Virginia Medical Center, St. Luke's in Bethlehem, PA, VA in Boston, and Leeds and Central Manchester in the UK.  (*See* Hilderbrand Aff. at Ex. A, pg. 31.)  Further, Plaintiff Hilderbrand received a PowerPoint presentation which represented 3si had 5 beta sites, a representation which was repeated by Defendant Lawrence.  (*See* Hilderbrand Aff. ¶ 7, and Ex. B, pg. 23.)  All of the above is false, as Defendants' first product is still not available but allegedly is "going to be available in beta form within the next three to four months." (*See* Carmel Aff. Ex. I at pgs. 9-10, lines 23-25, and line 1.)  Moreover, according to the PPM received by Plaintiff Miller, Defendant IVC received an

investment from Downing Partners of $1.5 million.  (*See* Miller Aff. Ex. A at pg. 53.)  However, Downing Partners never made the $1.5 million investment into IVC.  (*See* Carmel Aff. Ex. B at ¶ 20.)

Plaintiffs relied on the above-representations when deciding to accept employment with Defendants and make an investment in the private placements.  (*See* Detzel Aff. ¶¶ 8-9, Kiderman Aff. ¶¶ 8-9, Hilderbrand Aff. ¶¶ 8-9, and Miller Aff. ¶¶ 8-9.)  As a result of these misrepresentations, Plaintiffs lost $1 million in the investments, and $436,566.04 in wages. (*See* Detzel Aff. ¶¶ 9 and 15, Kiderman Aff. ¶¶ 9 and 14, Hilderbrand Aff. ¶¶ 9 and 17, and Miller Aff. ¶¶ 9 and 15.)

Accordingly, Plaintiffs have established that it is probable they will succeed on the merits of their fraud claim.

### 3.   Violation of the FLSA

As demonstrated in Plaintiffs' Affidavits, and the documentary evidence submitted therewith, Plaintiffs are likely to succeed on their alleged violations of the Fair Labor Standards Act ("FLSA").  (*See* Compl. ¶¶ 53-57.)

To be held liable under the FLSA, a person must be an "employer," which § 3(d) of the statute defines broadly as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d) (1994).

Under the 'economic reality' test, the relevant factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.  *See Herman v. RSR Sec. Servs. Ltd.,* 172 F.3d

132, 139 (2d Cir.1999).  No one of the four factors standing alone is dispositive.  *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir.1988).

Initially, Plaintiffs Hilderbrand, Detzel and Kiderman had employment agreements with Defendant 3si, while Plaintiff Miller had an employment agreement with Defendant IVC.  (*See* Detzel Aff. at Ex. B, Kiderman Aff. at Ex. B, Hilderbrand Aff. at Ex. C, and Miller Aff. at Ex. B.)  Both Defendants 3si and IVC, are/were owned and controlled by DIP and DP.  (*See* Detzel Aff. at Ex A, pgs. 9 and 29, Kiderman Aff. at Ex. A, pgs. 9 and 31, Miller Aff. at Ex. A, pgs. 8 and 29.)  Defendant Wagner was the Chairman and Chief Executive of 3si and IVC.  (*See* Detzel Aff. at Ex A, pg. 6, at Kiderman Aff. Ex. A, pg. 6, and Miller Aff. at Ex. A, pg. 5.)  DP is the General Manager of 3si and IVC, and has "complete control over the business affairs of [3si and IVC] and has exclusive control over the day-to-day operations of [3si and IVC]."  (*See* Detzel Aff. at Ex A, pg. 9, Kiderman Aff. at Ex. A, pg. 9, and Miller Aff. at Ex. A, pg. 8.)  The Board of Managers of 3si and IVC are Defendants Shaut, Buckingham and Wagner and they are "responsible for the major decisions affecting [3si and IVC]."  (*See* Detzel Aff. at Ex A, pg. 9, Kiderman Aff. at Ex. A, pg. 9, and Miller Aff. at Ex. A, pg. 8.)  All of these individuals had the power to hire and fire Plaintiffs, determined Plaintiffs' rate and method payment, supervised and controlled their conditions of employment, and maintained employment records.  (*See* Detzel Aff. ¶ 16, Kiderman Aff. ¶ 15, Hilderbrand Aff. ¶ 18, and Miller Aff. ¶ 16.)  At the time of Plaintiffs resignation, a total of $436,466.04 in wages and expenses were due and owing.  (*See* Detzel Aff. ¶ 15, Kiderman Aff. ¶ 14, Hilderbrand Aff. ¶ 17, and Miller Aff. ¶ 15.)

Accordingly, they are all employers under the FLSA.  Based upon the foregoing, Plaintiffs are likely to succeed on the merits of their claim for violations of the FLSA.[2]

---

[2] For the sake of brevity, Plaintiffs have only listed their breach of contract, fraud and FLSA claims.  However, Plaintiffs believe they will be successful on all their causes of action set forth in the Second Amended Complaint.

## POINT II

### THE COURT SHOULD GRANT PLAINTIFFS'
### MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs are entitled to a preliminary injunction to restrain and enjoin Defendants Wagner, Lawrence, Shaut, and Buckingham from continuing to waste, convert and misappropriate assets of Defendants DIP, DP, 3si and IVC so that they are not completely stripped of their assets, and destroyed, prior to judgment herein.

To establish the right to a preliminary injunction, the movant must demonstrate the following: (1) a likelihood of success on the merits of its claims or sufficiently serious questions going to the merits to make them a fair ground for litigation; (2) irreparable injury in the absence of preliminary injunctive relief; and (3) that hat the balance of hardships tips decidedly in favor of the moving party. *See No Spray Coalition, Inc. v. City of New York,* 252 F.3d 148, 150 (2d Cir. 2001). "A movant . . . need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt." *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir. 1985).

Even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Metro. Taxicab Bd. of Trade v. City of New York,* 615 F.3d 152, 156 (2d Cir. 2010) (internal quotations omitted).  This alternative "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the

costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010).

The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the merits. *See Main Street Baseball, LLC v. Binghamton Mets Baseball Club, Inc.*, 103 F.Supp.3d 244, 253 (N.D.N.Y. 2015). Even when the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration. *See Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 910 F.2d 1049, 1052–53 (2d Cir. 1990).

As shown below, Plaintiffs demonstrate each of the foregoing elements necessary to establish their entitlement to a preliminary injunction. Therefore, the Court should grant Plaintiffs' motion for a preliminary injunction.

### A.      Plaintiffs Are Likely To Succeed On the Merits

As discussed in detail above with respect to the Order of Attachment, Plaintiffs are likely to succeed on the merits of their claims.

### B.      Plaintiffs Will Be Irreparably Harmed Absent a Preliminary Injunction

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Marblegate Asset Management v. Education Management Corp.*, 75 F.Supp.3d 592, 605 (S.D.N.Y. 2014). Irreparable harm may exist where "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *S.E.C. v. Princeton Econ. Int'l, Ltd.,* 73 F.Supp.2d 420, 425 (S.D.N.Y. 1999). Preliminary injunctions are therefore appropriate to thwart a defendant from making a judgment uncollectible. *See id.*

Here, Plaintiffs has sufficiently demonstrated that Defendant Wagner has diverted money from Defendants DIP and DP, in at least two ways.  (*See* Carmel Aff. at Ex. C, pgs. 4 and 6.) First, Defendant Wagner liquidated partnership units in DIP, owned by his family trust, in the amount of $450,000.00, now lodged in the trust. (See *id*. at pg. 4.)  Second, Defendant Wagner has used DIP funds for personal expenses and transferred funds to his wife, who has no involvement in Downing.  (*See id*. at pg. 6.)

Next, Defendant 3si, a domiciliary of Massachusetts, is no longer under the umbrella of DIP or DP, but a new entity CliniFlow.  (*See* Carmel Aff. at Ex. D.)  Notably, as DP is the general partner of DIP, upon information and belief, Hanover is the general partner of CliniFlow. (*See* Carmel Aff. ¶¶ 15 and Ex. G.)

Finally, Defendant Wagner authorized loans in the total amount of $481,000 from Defendant IVC to Defendant 3si, effectively stripping Defendant IVC of its assets.  (*See* Carmel Aff. at Ex. B. ¶ 28.)  Left unchecked, Defendants conduct will continue and will likely result in the demise of Defendants 3si, DP, DIP and IVC.

As a result of the foregoing, Plaintiffs will be irreparably harmed in the absence of an injunction.  Indeed, the very existence of Defendants DP, DIP, 3si and IVC, the subjects of this action, and Plaintiffs' employment and investments therein, may be destroyed and any judgment rendered herein meaningless.

**C.      A Balancing Of The Equities**
         **Weighs Decidedly In Plaintiffs' Favor**

The balance of hardships tips decidedly in Plaintiffs favor.  This factor means, in essence, that preliminary relief is not warranted unless the court finds that the importance of the injunction to the plaintiff is such that it outweighs the inconvenience which will be visited upon

the defendant from the issuance of the injunction. *See Heldman v. United States*, 354 F.Supp.
1241, 1250 (S.D.N.Y. 1973).

Here, Defendants DIP, DP, 3si and IVC, will not be harmed, or suffer any real hardship,
by the grant of a preliminary injunction.  The preliminary injunctive relief sought herein will
prohibit Defendants from engaging in improper conduct, such as looting DP, DIP, 3si and IVC
and wasting its assets.  Thus, the injunctive relief sought in this motion merely seeks to maintain
the *status quo* by prohibiting unlawful conduct that would threaten the continued existence and
value of DIP, DP, 3si and IVC pending the adjudication of this action.  Indeed, even if
Defendants are ultimately successful in this action, they will not suffer any harm as a result of
the preliminary injunction.

On the other hand, Plaintiffs would suffer grave harm if a preliminary injunction is not
granted.  As discussed above, if Defendants are permitted to continue their improper conduct the
very existence of DIP, DP, 3si and IVC will be threatened.  Thus, in the absence of a preliminary
injunction preventing Defendants wrongful conduct, DIP, DP, 3si and IVC may not be in
existence by the time a judgment is rendered in this action.

Accordingly, based upon the foregoing, a balance of the equities tips decidedly in
Plaintiffs' favor.

## POINT III

### THE COURT SHOULD ISSUE A
### TEMPORARY RESTRAINING ORDER

The Court should also grant Plaintiffs' application temporary restraining order, enjoining
Defendants DIP, DP, 3si, IVC, Wagner, Shaut, Buckingham or Lawrence, pending a hearing of
this motion, from, *inter alia*: (a) transferring, selling, assigning, encumbering, dissipating or
otherwise disposing of any assets or property of Defendants DIP, DP, 3si and IVC; and (b) from

- 24 -

taking any corporate action, exercising any corporate powers, including the borrowing of funds, selling or issuing equity or debt, pledging corporate assets other otherwise conducting or noticing any meeting or holding any vote by the directors or shareholders for any purpose, except with the permission of the Court.

It is well established that in this Court the standard for an entry of a TRO is the same as for a preliminary injunction. *See, e.g., Echo Design Group, Inc. v. Zino Davidoff S.A.,* 283 F.Supp.2d 963, 966 (S.D.N.Y. 2003); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,* 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical.")

As discussed in detail above, Defendants have looted, diverted and misappropriated assets of DIP, DP, 3si and IVC and will likely to continue to do so unless they are restrained from doing so. Accordingly, the Court should grant a temporary restraining order prohibiting Defendants from engaging in such conduct pending the hearing of this motion.

## Conclusion

For all the foregoing reasons, the Court should grant Plaintiffs' motion in its entirety.

Dated: New York, New York
      November 15, 2016

CARMEL, MILAZZO & DiCHIARA, LLP

By: _____
      Ross D, Carmel, Esq.
      Christopher P. Milazzo, Esq.
261 Madison Avenue, 9th Floor
New York, New York 10016
(212) 658-0458

*Attorneys for Plaintiffs*