Ethan J. Brown (admitted pro hac vice)
 *ethan@bnsklaw.com*
Sara C. Colón (SBN 4815908)
 *sara@bnsklaw.com*
**BROWN NERI SMITH & KHAN LLP**
11766 Wilshire Boulevard, Suite 1670
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Defendants,*
Downing Investment Partners, LP;
Downing Partners, LLC; 3SI Systems,
LLC; IVC Healthcom, LLC; David W.
Wagner; Michael H. Shaut; Richard
Buckingham; Jeff Rice; Marc M.
Lawrence; Michael Grumbine; Brett
Giffin; Marco Zenati; and George Robbie

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID HILDERBRAND; DAVID KIDERMAN; RYAN DETZEL; MARK MILLER, <br><br> Plaintiffs, <br><br> v. <br><br> DOWNING INVESTMENT PARTNERS, LP; DOWNING PARTNERS, LLC; 3SI SYSTEMS, LLC; IVC HEALTHCOMM, LLC; DAVID W. WAGNER; MICHAEL H. SHAUT; RICHARD BUCKINGHAM; JEFF RICE; MARC M. LAWRENCE; MICHAEL GRUMBINE; BRETT GIFFIN; MARCO ZENATI; GEORGE ROBBIE; GLENN HAUFLER; and BRAD PULVER; <br><br> Defendants. | Case No.: 16-CV-04040 <br><br> **NOTICE OF CORRECTED FILING** <br><br> Complaint Filed:  May 31, 2016 <br> Trial Date:  Not yet set |

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants Downing Investment Partners, LP; Downing Partners, LLC; 3SI Systems, LLC; IVC Healthcom, LLC; David W. Wagner; Michael H. Shaut; Richard Buckingham; Jeff Rice; Marc M. Lawrence; Michael Grumbine; Brett Giffin; Marco Zenati; and George Robbie (the "Downing Defendants") hereby correct their filing of the Request for Judicial Notice ("RJN") (Dkt. No. 99-1) filed in connection to their Motion to Dismiss (Dkt. Nos. 98 and 99). The Downing Defendants inadvertently failed to file sub-exhibits A-C to RJN Exhibit E (Downing Digital Healthcare Group, LLC's Confidential Private Offering Memeorandum).  Sub-exhibits A-C are attached hereto and referenced to the RJN.

Dated: December 8, 2016     **BROWN NERI SMITH & KHAN, LLP**

By:  __/s/ Sara C. Colón_____
      Sara C. Colón

      *Attorneys for Defendants*,
      Downing Investment Partners, LP; Downing
      Partners, LLC; 3SI Systems, LLC; IVC
      Healthcom, LLC; David W. Wagner;
      Michael H. Shaut; Richard Buckingham;
      Jeff Rice; Marc M. Lawrence; Michael
      Grumbine; Brett Giffin; Marco Zenati; and
      George Robbie

# EXHIBIT A

# *Downing Partners*

### DIGITAL HEALTHCARE GROUP



# DOWNING DIGITAL HEALTHCARE



## *Commercializing the delivery of innovative solutions for high-impact healthcare problems*

© Downing Partners LLC 2014. All Rights Reserved                                        COMPANY CONFIDENTIAL                                        2



**Downing Partners**
www.downingpartners.com

# Digital Healthcare Is Large And Growing Rapidly

**…the primary root cause of more than 70 percent of treatment delays and sentinel events is a breakdown in communications.**
**--Healthcare without Bounds: Point of Care Communications for Nursing 2014**



**US Health IT to reach $31B by 2017**
-Research and Markets North American IT Market Report 2017

**Global mobile health market to grow at 32.3% CAGR through 2020**
-Reported in Fierce MobileIT December 4, 2013

**Global mobile health market valued at $58.8B by 2020**
-Reported in Fierce MobileIT December 4, 2013

© Downing Partners LLC 2014. All Rights Reserved            COMPANY CONFIDENTIAL                                          3

**Downing Partners**
www.downingpartners.com

# Digital Health Investment Growing Rapidly

## Investment



- Digital health funding increased 39% in 2013 to $1.98 billion and has more than doubled since 2011

- *Digital health funding in 2014 has broken previous records, with funding through the first half of the year exceeding the 2013 total*

Source: Rock Health Digital Health Funding 2014 Midyear Review

© Downing Partners LLC 2014. All Rights Reserved

**Downing Partners**
www.downingpartners.com
Case 1:16-cv-04040-KPF Document 101 Filed 12/08/16 Page 8 of 35

# Digital Health Investment—Key Sectors

*The six major themes of 2013 comprised almost 50% of all funding for the entire year*

 **$245M**

**EHR AND CLINICAL WORKFLOW**
Electronic health records and surround applications, including clinical workflow and support



 **$161M**

**ANALYTICS AND BIG DATA**
Data aggregation and analysis to support a wide range of health care use cases

 **$146M**

**DIGITAL MEDICAL DEVICES**
Hardware/software designed to treat a specific disease or condition




 **$136M**

**WEARABLES AND BIOSENSING**
Wearable consumer devices that measure specific biometrics



 **$126M**

**POPULATION HEALTH MANAGEMENT**
Comprehensive platforms designed to manage the health of populations under the shift to risk-based payment models

 **$119M**

**HEALTHCARE CONSUMER ENGAGEMENT**
Consumer tools for the purchasing of healthcare services or health insurance (B2B and B2C)



 **= Sectors Where Downing Digital Healthcare Is Active**

**Source: Rock Health Digital Health Funding 2013 Year in Review**

© Downing Partners LLC 2014. All Rights Reserved

# Downing Digital Healthcare Focus

## Novel Technology Solutions That Improve:



**Patient Safety**

**Quality of Delivery**



**Healthcare Efficiency**

- **Reduce preventable complications**
- **Reduce morbidity and mortality**
- **Reduce hospital days**

- **Improve the speed and quality of care through new delivery models and effective information sharing**

- **Reduce cost of healthcare delivery**
- **Focus medical manpower on healthcare rather than administration**

© Downing Partners LLC 2014. All Rights Reserved

# The Downing Difference

*Unique company positioning drives high potential investment returns*

**<u>Human investment that drives success</u>**
- Healthcare and technology expertise
- Serial entrepreneurs who have successfully developed and exited companies worth >$1 billion.
- Invested partners immersed in a startup business
- Shorter time to commercialization

**<u>Targeted investments</u>**
- Rapid commercialization opportunities that require minimal regulatory review & avoid long clinical trials
- Comparatively low capital investment requirements
- Large ownership stakes (target 60%)
- High potential exit valuations (5X ROI) with early exit opportunities (3-5 years)

© Downing Partners LLC 2014. All Rights Reserved

COMPANY CONFIDENTIAL

**Downing Partners**
www.downingpartners.com

# Experienced Executive Team

## Healthcare



**David Wagner
Chairman**



**Marc Lawrence
President
DDHG**



**Paul Giroux
Chief Marketing
Officer**

## Technology



**John Ioannou
Chief Operating
Officer**



**Steven Koes
Chief Technology
Officer, DDHG**



**Debra Lang
VP Operations
DDHG**

## Start Up Development



**Dick Buckingham
Vice Chairman**



**Michael Shaut
President**



**Eric Hassman
Chief Financial
Officer**

## Experience

- Over 200 years of management experience
- Over 75 years healthcare experience
- Over 100 years software/IT experience
- Billions of dollars raised to fund the growth of multiple companies
- Founders and/or Chief Executives of dozens of different businesses
- Successfully managed exits for numerous businesses valued at more than $1 billion

© Downing Partners LLC 2014. All Rights Reserved                COMPANY CONFIDENTIAL

# Downing Investment Group



**Downing Partners**
www.downingpartners.com

# Build: 3Si Surgical Safety Systems

## The Problem

- Cardiac Surgery has 4 times as many adverse events as other types of surgery.
- > 1 million CABG surgeries globally
- Post Operative complications occur in ~12% of cardiac surgeries
- Breakdowns in Teamwork that lead to surgical flow or operative disruptions occur at a rate of 17.4 / hour
- Typical cost of <u>each</u> post-operative complication is $15,500

## 3Si Solution

Intra-operative Workflow, Alerts and Surgical Checklists
- Powered by Speech Recognition Technology
- Software solution deployed in the O.R.
- Monitors surgical workflow from pre-operative to post-operative phases
- Uses speech recognition to follow the surgical team through entire procedure
- Gates transitions from one phase of the procedure to the next
- Proactively alerts surgical team if a key step is missed
- Summarizes post-operative data for detailed debriefings



*Downing Partners*
www.downingpartners.com

# Buy: Company F

## The Problem

- Coumadin patients need regular blood monitoring to minimize clot risk
- Compliance of monitoring is low with difficulty of accessing doctor's office visit
- Cost to patients and doctors is substantial and inconvenient

## Company F Solution

- Ability to monitor blood indicators and share uplinked data remotely
- Provides regular patient information to doctor without need for office visit
- Improved efficacy for patient who avoids doctor's office visit
- HIPAA compliant and secure cloud based technology



© Downing Partners LLC 2014. All Rights Reserved          COMPANY CONFIDENTIAL

# Downing Partners
www.downingpartners.com

# Downing Digital Healthcare Initial Portfolio

| Company | Product | Market Need | Market Entry | 2017 Revenue |
|---|---|---|---|---|
|  | Intra-operative workflow, alerts and surgical checklists powered by speech recognition technology. | • Cardiac surgery has a 4x greater incidence of complications<br>• Roughly half of these are due to preventable errors<br>• The cost to hospitals is billions of dollars annually | Q4 2014 | $50M |
| Company F* | Provides convenient, efficient and reliable remote monitoring services for chronically managed patients with a proprietary multi-signal processing technology for remote clinical data capture, transfer and embedding into EHR | Improves healthcare efficiencies and patient care, generating significant cost and time savings while improving patient outcomes. | 2012 | $17M |
| Company I* | Company designs and manufactures a flexible wireless vital signs platform that can be customized to provide a range of monitoring products. Highly miniaturized, light weight and with an extremely long battery life, the monitoring devices are small, unobtrusive and easily worn under clothes. | • Fills gap in home care market<br>• Provides exceptional clinical value for affordable care<br>• Ability to "monitor the unmonitored" | Q4 2014 | TBD |
| Company FS* | Bluetooth-enabled wireless stethoscope which is competitively priced. Initial use for patients requiring home care following procedure (Cardiac, transplant, etc.).  This would also be useful for at-home LTC patients.  10 years into primary patent. | • Positioned as a mainstay for telemedicine at a price point the average household can afford.<br>• Opportunity for the home and ambulatory segments<br>• The ambulatory value for civil and military could be very high. | Q4 2014 | TBD |

*under negotiation

© Downing Partners LLC 2014. All Rights Reserved          COMPANY CONFIDENTIAL

**Downing Partners**
www.downingpartners.com

# Proforma Financial Projections

| DDHG Executive Summary | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Portfolio Income:** | | | | | | | | | | |
| Portolio Profit Distributions | | - | | - | $ | 2,028 | $ | 20,169 | $ | 55,169 |
| Portolio Commission Payments | $ | 74 | $ | 592 | $ | 1,665 | $ | 3,308 | $ | 5,389 |
| Exit Proceeds - DDHG Portion | | - | | - | | - | $ | - | $ | 302,300 |
| **Total Income** | $ | 74 | $ | 592 | $ | 3,693 | $ | 23,477 | $ | 362,858 |
| **Operating Expenses** | $ | 1,783 | $ | 3,973 | $ | 4,172 | $ | 4,380 | $ | 4,599 |
| **Operating Profit (EBITDA)** | $ | (1,709) | $ | (3,381) | $ | (479) | $ | 19,097 | $ | 358,259 |
| **Cash Balance** | $ | 291 | $ | 2,410 | $ | 1,932 | $ | 21,029 | $ | 379,287 |
| **Capital Inflows** | $ | 6,500 | $ | 12,500 | $ | - | $ | - | $ | - |
| **Capital Outflows** | $ | 4,500 | $ | 7,000 | $ | - | $ | - | $ | - |

($000s)

© Downing Partners LLC 2014. All Rights Reserved

**Downing Partners**
www.downingpartners.com

# Capital & Investment Recap

*We are currently seeking strategic partners and/or investment partners to augment our capital base*

| Round | Funds |
|---|---|
| Common stock completed | $10,000 |
| Series A Preferred round completed | $500,000 |
| Series B Preferred round completed | $1,250,000 |
| Series C Preferred round underway | $4,500,000 |
| Pre-money valuation | $25,500,000 |
| Post-money valuation | $30,000,000 |

**Target raise is $4.5MM but will go as high as $6.5MM**

© Downing Partners LLC 2014. All Rights Reserved                    COMPANY CONFIDENTIAL

**Downing Partners**
www.downingpartners.com

# Downing Digital Healthcare Summary

*Unique Company Positioning & Approach Drives High Potential Investment Returns*

- ✓ Rapid commercialization opportunities that require minimal regulatory review resulting in lower capital investment and accelerated exit opportunities

- ✓ New, disruptive and versatile digital healthcare platforms

- ✓ Multi-billion dollar market in digital healthcare

- ✓ Active ongoing discussions with leading strategic partners

- ✓ Knowledgeable team with deep industry and global expertise

- ✓ Near-term product commercialization across several companies…not "science projects"

- ✓ Low capital requirements and high profit margins

- ✓ High potential exit valuations (high exit multiples & early exit opportunities)

### *Commercializing the delivery of innovative solutions for high-impact healthcare problems*

© Downing Partners LLC 2014. All Rights Reserved

# EXHIBIT B

**Downing Digital Healthcare Group, LLC**

**Second Amended & Restated Limited Liability Company Agreement**

This Second Amended & Restated Limited Liability Company Agreement (the **"Agreement"**) is made as of June 2, 2014 (the **"Effective Date"**), by and among the persons identified as the Members of Downing Digital Healthcare Group, LLC (the **"LLC"**) on the signature pages hereto (such persons and their respective permitted successors in interest being hereinafter referred to individually as a "**Member**" or collectively as "**Members**").

WHEREAS, the LLC was formed as a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.), as amended (the **"Act"**), by the filing of a Certificate of Formation in the office of the Secretary of State of the State of Delaware on December 17, 2013;

WHEREAS, the Members entered into a Limited Liability Company Agreement on December 17, 2013 (the "**Prior Agreement**");

WHEREAS, the Members entered into a First Amended & Restated Limited Liability Company Agreement on January 11, 2014 (the "**Prior Agreement**");

WHEREAS, the Members wish to amend and restate the Prior Agreement and to set out fully their respective rights, obligations and duties regarding the LLC and its affairs, assets, liabilities and the conduct of its business as set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein, the parties hereto hereby agree as follows:

1.      Purpose; Powers.  The LLC is organized to carry on any lawful business, purpose or activity permitted by the Act. The LLC shall have the power to make and perform all contracts and to engage in all activities and transactions necessary or advisable to carry out the purposes of the LLC, and all other powers available to it as a limited liability company under the laws of the state of Delaware.

2.      Capital Contributions.

        (a)      Each Member has contributed the cash and other property in the amount specified on Schedule A attached hereto to the capital of the LLC as of the date hereof (each a **"Capital Contribution"** and collectively, the **"Capital Contributions"**).  In the event that further Capital Contributions are made, the Board of Managers shall update Schedule A to reflect such Capital Contributions.

        (b)      If the Members holding a majority of the outstanding Units (as defined below) (the "**Requisite Members**"), at any time or from time to time, determine that the LLC requires additional Capital Contributions, then each Member then owning Preferred Units shall have the right, but not the obligation, to contribute its share of additional Capital Contributions on a pro rata basis based on such Member's ownership of Preferred Units ("**Right to Contribute**").  The terms of any issuance of Units in connection therewith shall be determined by the Board of Managers and the Requisite Members.  The LLC shall provide notice to each Member of the amount of additional Capital Contributions and of its Right to Contribute ("**Notice**").  Each Member shall have ten (10) days to notify the LLC of its exercise of its Right to Contribute.  The closing of such additional Capital Contribution shall occur within forty-five (45) days of the Notice.  Notwithstanding the foregoing, the LLC may elect to give Notice to the Members within thirty (30) days after an additional Capital Contribution.

(c) No Member shall be required to contribute any additional capital to the LLC, and no Member shall have any personal liability for any obligation of the LLC in excess of his or her Capital Contribution.

3. Capital Accounts. A separate capital account (each, a **"Capital Account"**) shall be maintained for each Member in accordance with the rules of Section 1.704-1(b)(2)(iv) of the U.S. Treasury Regulations (the **"Treasury Regulations"**), and this Section 3 shall be interpreted and applied in a manner consistent with said section of the Treasury Regulations. The LLC may adjust the Capital Accounts of its Members to reflect revaluations of the LLC property whenever the adjustment would be permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*). In the event that the Capital Accounts of the Members are so adjusted, (i) the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*) for allocations of depreciation, depletion, amortization and gain or loss, as computed for book purposes, with respect to such property and (ii) the Members' distributive shares of depreciation, depletion, amortization and gain or loss, as computed for tax purposes, with respect to such property shall be determined so as to take account of the variation between the adjusted tax basis and book value of such property in the same manner as under Section 704(c) of the Internal Revenue Code of 1986, as amended (the **"Code"**). In the event that Code Section 704(c) applies to LLC property, the Capital Accounts of the Members shall be adjusted in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*) for allocations of depreciation, depletion, amortization and gain and loss, as computed for book purposes, with respect to such property. The Capital Accounts shall be maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any distributions to any Members in liquidation or otherwise. Distributions (including distributions in liquidation) shall be made to the Members in accordance with Section 7 hereof. Notwithstanding any provision contained herein to the contrary, no Member shall be required to restore any negative balance in its Capital Account.

4. Allocations of Profits and Losses. The net income or net loss of the Company, as determined for book purposes, for each taxable year or portion thereof shall be allocated among the Members and credited or debited to their respective Capital Accounts in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv), so as to ensure to the maximum extent possible (i) that such allocations satisfy the economic effect equivalence test of Treasury Regulations Section 1.704-1(b)(2)(ii)(*i*) (as provided hereinafter) and (ii) that all allocations of items that cannot have economic effect (including credits and nonrecourse deductions) are allocated to the Members in accordance with the Members' interest in the LLC, which, unless otherwise required by Code Section 704(b) and the Treasury Regulations promulgated thereunder, shall be in proportion to their Units. To the extent possible, net income or net loss shall be allocated in such a manner that the balance of each Member's Capital Account at the end of any taxable year (increased by the sum of (a) such Member's "share of partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(g)(1) and (b) such Member's "share of partner nonrecourse debt minimum gain" as defined in Treasury Regulations Section 1.704-2(i)(5)) would be positive to the extent of the amount of cash that such Member would receive (or would be negative to the extent of the amount of cash that such Member would be required to contribute to the LLC) if the LLC sold all of its property for an amount of cash equal to the book value (as determined pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)) of such property (reduced, but not below zero, by the amount of nonrecourse debt to which such property is subject) and all of the cash of the LLC remaining after payment of all liabilities (other than nonrecourse liabilities) of the LLC were distributed in liquidation immediately following the end of such taxable year in accordance with Section 7. All allocations under this Section 4 shall be made by treating all outstanding unvested Incentive Units as vested Incentive Units in compliance with the requirements of Section 4.01 of Revenue Procedure 2001-43, 2001-2 C.B. 191.

5.    <u>Management</u>.

(a)    <u>Management by Board of Managers</u>.  The Members hereby unanimously agree that full responsibility for management and control of the business and affairs of the LLC shall be vested in a board of managers (the **"Board of Managers"**) pursuant to Section 18-402 of the Act.

(b)    <u>Power and Authority of Board of Managers</u>.  The Board of Managers (acting on behalf of the LLC) shall have full, complete and exclusive control of the management and conduct of the business of the LLC and the authority to do all things necessary or appropriate to carry out the purposes and powers of the LLC as described herein and to delegate to one or more members of the Board of Managers or other persons, including officers of the LLC, such of its duties and responsibilities as the Board of Managers may determine, with full discretion and without any further act, vote or approval of any Member (other than as set forth herein), including without limitation the right and authority:

(i)    to manage the business and affairs of the LLC and for this purpose to employ, retain or appoint any officers, employees, consultants, agents, brokers, professionals or other persons in any capacity for such compensation and on such terms as the Board of Managers deems necessary or desirable and to delegate to such persons such of their duties and responsibilities as the Board of Managers shall determine;

(ii)    to enter into, execute, deliver, acknowledge, make, modify, supplement or amend any documents or instruments in the name of the LLC or to direct any duly appointed officer of the LLC to make, execute, assign, acknowledge, and file on behalf of the LLC any and all documents or instruments of any kind which the Board of Managers may deem necessary or appropriate in carrying out the business and affairs of the LLC, including, without limitation, powers of attorney, agreements of indemnification, documents, or instruments of any kind or character, and amendments thereto (and no person, firm or corporation dealing with the Board of Managers shall be required to determine or inquire into the authority or power of the Board of Managers to bind the LLC);

(iii)    to borrow money or otherwise obtain credit and other financial accommodations on behalf of the LLC and to perform or cause to be performed all of the LLC's obligations in respect of its indebtedness and any mortgage, lien or security interest securing such indebtedness;

(iv)    to accept subscriptions for Units (as defined below) and issue said Units to any subscribers, and to execute such documents and make any and all filings necessary in connection therewith; and

(v)    to make elections and prepare and file returns regarding any federal, state or local tax obligations of the LLC.

Unless otherwise provided in this Agreement, any action taken by the Board of Managers or the Chairman (as defined below), and the signature of the Board of Managers or the Chairman on any agreement, contract, instrument or other document on behalf of the LLC, shall be sufficient to bind the LLC and shall conclusively evidence the authority of the Board of Managers or the Chairman and the LLC with respect thereto.  Except as may be approved by the Board of Managers or as expressly set forth in this Agreement, no Board Member (except the Chairman), acting individually, shall have any authority, right or power, solely by virtue of being a Board Member, to bind the LLC.

(c)     <u>Composition; Election; Chairman; Removal</u>.

(i)     <u>Number</u>.  The initial number of managers (each, a **"Board Member"**) which shall constitute the whole Board of Managers shall be two (2).  The number of Board Members constituting the entire Board of Managers may be decreased or increased upon a vote of the Requisite Members.

(ii)     <u>Election of Board Members</u>.  Board Members shall be elected by the affirmative vote of the Requisite Members.  Board Members shall hold office until their respective successors are duly elected and qualified.  Members shall not be entitled to cumulative voting (e.g., a Member aggregating votes entitled to be cast for more than one Board Member position in favor of one candidate) when electing Board Members.

(iii)     <u>Board of Managers</u>.  The Members hereby elect David W. Wagner and Richard Buckingham as the initial Board Members.

(iv)     <u>Chairman</u>.  The initial Chairman shall be David W. Wagner. Thereafter, the Chairman (and any successors thereto) shall be elected by the Requisite Members.  The Chairman must at all times be a Board Member.  The Chairman shall serve in such capacity until the earlier of (a) the time when he no longer is a Board Member and (b) the time when his successor is duly elected and qualified.  The Chairman (i) shall preside over all meetings of the Board of Managers, (ii) may execute agreements and contracts on behalf of the LLC and (iii) shall have such other powers and duties as are specified in this Agreement or as are delegated by the Board of Managers.  If the Chairman is unavailable to attend a meeting of the Board of Managers, the Board Members shall appoint from the available Board Members a substitute to serve as Chairman for that meeting.  The Chairman shall be entitled to such salary or other compensation as the Board of Managers shall determine.

(v)     <u>Vacancies</u>.  In the event of any vacancy in the office of a Board Member as a result of the death, incapacity, resignation or removal, with or without cause, of a Board Member, such vacancy shall be filled by the affirmative vote or written consent of the Requisite Members.  The Board Member elected to fill any vacancy shall hold office until such Board Member's successor is duly elected and qualified.

(vi)     <u>Removal of Board Members</u>.  Any Board Member may be removed immediately, with or without cause, by the affirmative vote or written consent of the Requisite Members.  Any vacancy caused by any such removal shall be filled as provided in <u>Section 5(c)(v)</u> above.

(d)     <u>Meetings</u>.  Regular meetings of the Board of Managers may be held without notice on such date and at such place and time as a majority of the Board Members may from time to time determine; provided that if any Board Member is unable to attend in person, such Board Member shall be permitted to attend by conference telephone or other communications equipment.  Special meetings of the Board of Managers may be called by one or more Board Members in writing or by telephone or facsimile (receipt confirmed) or electronic mail (followed by confirmation by telephone) designating the date, time and place.  Meetings of the Board of Managers may be held by conference telephone or other communications equipment by means of which all participating Board Members can simultaneously hear each other during the meeting.  To the fullest extent permitted by Section 18-407 of the Act and subject to the reasonable approval of a majority of the Board Members, any Board Member may delegate to one other person designated by that Board Member (including without limitation another Board Member present at such meeting) that Board Member's rights and obligations to participate in and vote at any

4

meeting of the Board of Managers.  The Board Member's designation shall be set forth in writing, and delivered at least twelve (12) hours prior to the meeting, personally or by facsimile (receipt confirmed) or electronic mail (followed by confirmation by telephone), to the Chairman.  Unless otherwise explicitly set forth in the designation, the authority granted to the designee shall be unlimited subject to the designating Board Member's authority hereunder, and the Board Member making the designation shall be bound by any action or omission by his or her designee at the meeting.  Persons who are not Board Members may attend any meeting of the Board of Managers if approved by a majority of the Board Members present at such meeting.

(e)    Quorum.  No action may be taken at a meeting of the Board of Managers unless a quorum exists for such meeting consisting of at least a majority of the Board Members then in office.  Less than a quorum may adjourn any meeting from time to time and the meeting may be held as adjourned without further notice upon reaching a quorum.

(f)    Action by Written Consent.  Any action which may be taken by the Board of Managers under this Agreement may be taken without a meeting if consents in writing setting forth the action so taken are signed by all of the Board Members then in office.  In addition, any action which may be taken by the Members under this Agreement may be taken without a meeting if consents in writing setting forth the action so taken are signed by Members who own Units having voting power to cast not less than the minimum number of votes necessary for such action to be taken by the Members.

(g)    Notice of Meetings.  Notice of the time, date and place of all meetings of the Board of Managers shall be given to each Board Member by the Chairman, or by one of the Board Members calling the meeting.  Notice shall be given to each Board Member in person, by telephone or by facsimile (receipt confirmed) or electronic mail sent to his or her business or home address at least twenty-four (24) hours in advance of the meeting, or by written notice mailed to his business or home address at least forty-eight (48) hours in advance of the meeting.  Notice need not be given to any Board Member if a written waiver of notice is executed by him or her before or after the meeting, or if communication with such Board Member is unlawful.  A notice or waiver of notice of a meeting of the Board of Managers need not specify the purposes of the meeting.

(h)    Compensation of Board Members.  Board Members, as such, shall not receive any stated salary or compensation for their services, but the Board of Managers may authorize the reimbursement to Board Members of expenses, if any, for attendance at meetings of the Board of Managers; provided that nothing herein contained shall be construed to preclude any Board Member from serving the LLC in any other capacity and receiving compensation therefor.

(i)    Resignations.  Any Board Member may resign at any time by giving written notice to the Board of Managers.  Any such resignation shall take effect at the time specified therein, or, if no time is specified, upon receipt thereof by the Board of Managers; and unless otherwise specified therein, acceptance of such resignation shall not be necessary to make it effective.

(j)    Committees.  The Board of Managers from time to time may appoint one or more committees, to perform any functions or conduct any activities that the Board of Managers has the right, power, and authority to perform or conduct.

(k)    Fiduciary Relationship. Notwithstanding anything set forth in this Agreement to the contrary, each Board Member shall have the same fiduciary duties to the LLC which a corporate director has to a corporation under Delaware law.  No Board Member shall be liable to the LLC or its Members for monetary damages for breach of fiduciary duty as a Board Member or otherwise liable, responsible or accountable to the LLC or its Members for monetary damages or otherwise for any acts

performed, or for any failure to act; provided, however, that this provision shall not eliminate or limit the liability of a Board Member (i) for acts or omissions which involve intentional misconduct or a knowing violation of law, or (ii) for any transaction from which the Board Member received any improper personal benefit.  In addition, no Member shall owe any fiduciary duties to any other Member(s).

(l)     Officers.  The Board of Managers or the Chairman may appoint such officers and agents of the LLC as the Board of Managers or the Chairman shall deem necessary or appropriate to carry out the business of the LLC upon such terms and conditions which the Board of Managers or the Chairman may determine.  Any such officer shall hold his or her respective office for the term specified by the Board of Managers or the Chairman unless earlier removed by the Board of Managers or the Chairman.

The initial officers of the LLC shall be as follows:

| Name | Title |
|---|---|
| David W. Wagner | President and Chief Executive Officer |
| Richard Buckingham | Treasurer, Secretary and Chief Financial Officer |

(m)     Resignation.  Any officer or agent of the LLC may resign at any time by giving written notice to the Board of Managers or to the Chairman of the LLC.  Any such resignation shall take effect at the time specified therein or, if no time is specified, upon receipt thereof; and unless otherwise specified therein, acceptance of a resignation shall not be necessary to make it effective.

(n)     Removal; Vacancies; Transfer of Duties.  Any officer or agent of the LLC may be removed from office, with or without cause, by the Board of Managers.  Any vacancy for any reason shall be filled by a person designated by the Board of Managers or the Chairman.  The Board of Managers or the Chairman in its sole and absolute discretion may transfer the power and duties, in whole or in part, of any officer to any other officer, or persons.

6.     Capital.

(a)     Units.  The interests of the Members in the LLC shall henceforth be represented by issued and outstanding membership interests (the **"Units"**).  There shall initially be five (5) classes of Units, Common Units ("**Common Units**"), Series A Preferred Units ("**Series A Preferred Units**"), Series B Preferred Units ("**Series B Preferred Units**"), Series C Preferred Units ("**Series C Preferred Units**"), [the Series A, B, and C Preferred Units, collectively, (the "**Preferred Units**")] and Incentive Units ("**Incentive Units**")  As of the date hereof, each Member holds the Units specified on Schedule A attached hereto.  The Board of Managers shall maintain a record of all issued and outstanding Units and the dates and amounts of all Capital Contributions on Schedule A, and shall make any amendments and/or updates thereto as may be necessary from time to time.  Schedule A may also set forth the Strike Price, if any, applicable to Incentive Units granted pursuant to the Incentive Equity Pool (as defined below).

(b)     Incentive Units.  The Company has reserved 150,000 Incentive Units for future issuances to employees, consultants, directors, managers or others providing services to the Company (the "**Incentive Equity Pool**") pursuant to award agreements ("**Award Agreements**") approved by either the Board or the Compensation Committee.  The terms and conditions of each Award Agreement (which do not need to be the same) must be approved by either the Board or the Compensation Committee.  The Board and the Compensation Committee shall each have the authority to make all interpretations and determinations arising out of or relating to the Award Agreements and/or the Incentive Equity Pool.  Any such interpretation or determination made by either the Board or the Compensation Committee shall be final and binding on all interested parties.  Without limiting the generality of the foregoing, the Board and

6

the Compensation Committee shall have the full power and authority to take any and all actions (including the creation of "sub-plans") that it deems necessary, advisable or desirable for purposes of satisfying applicable securities, tax or other laws of various jurisdictions or for the administration of the Incentive Equity Pool.  For purposes of Rule 701 under the Securities Act and applicable state "blue sky" laws, this Agreement shall constitute a "plan."  Any Member who receives Class C Units in connection with the performance of services shall make a timely and effective election under Section 83(b) of the Code with respect to such Incentive Units.  Except as otherwise determined by the Compensation Committee, both the Company and all Members will treat such Incentive Units as outstanding for tax purposes, such Member as a partner for tax purposes with respect to such Incentive Units and file all tax returns and reports consistently with the foregoing.  The Incentive Units are intended to be treated as "profits interests" under Revenue Procedure 93-27, I.R.B. 1993-24, June 9, 1993 and Revenue Procedure 2001-43, I.R.B. 2001-34, August 2, 2001.  In connection with the issuance of Incentive Units, the Board or the Compensation Committee shall set a strike price with respect to such Incentive Units (the "**Strike Price**").  The Strike Price with respect to each Incentive Unit will generally be equal to the aggregate amount that would be distributed pursuant to Section 7(c) if the Company sold its assets for their Fair Market Value (as defined below), satisfied its liabilities (limited, in the case of nonrecourse liabilities, to the collateral securing or otherwise available to satisfy such liabilities) and distributed the net proceeds to the holders of Units in liquidation of the Company at such time.  The Board and the Compensation Committee may adjust the Strike Price as appropriate (i) to reflect the consideration, if any, paid in connection with any issuance of Incentive Units, (ii) to reflect an increase to the Fair Market Value of the Company's assets that is attributable to Capital Contributions made to the Company in respect of Capital Units and (iii) when and as permitted pursuant to any Award Agreement.  The determination of the Board or the Compensation Committee of the Strike Price shall be final, conclusive and binding on all Members, even if the Strike Price does not reflect the actual amount that would be distributed with respect to the Units at the time the Incentive Units are issued.  In the event the Board or the Compensation Committee issues additional Incentive Units with a Strike Price lower than the Strike Price associated with a prior issuance of Incentive Units, the Board may, in its sole discretion, reduce the Strike Price of the Incentive Units issued at the higher Strike Price.

       7.      <u>Distributions</u>.

       (a)     <u>Tax Distributions</u>. At such times as the Board of Managers shall determine, in its sole discretion, the Board of Managers shall cause the LLC to make distributions (**"Tax Distributions"**) to the Members with respect to any taxable year in an amount equal to each Member's (or, in the case of a Member that is a partnership, disregarded entity, or S-corporation, its direct or indirect owners') U.S. federal and state tax liability incurred with respect to such Member's distributive share of the LLC's net income and gain for such year over such Member's distributive share of the LLC's net loss and deductions for such year as determined for federal tax purposes.  Tax Distributions shall be treated as an advance on other distributions to which a Member is entitled in respect of such Member's Units, and shall therefore reduce the amount of other distributions payable to that Member under this Agreement in respect thereof.

       (b)     <u>Interim Distributions</u>.  Upon any distributions that the Board of Managers determines, in its sole discretion, to cause the LLC to make, other than Tax Distributions pursuant to <u>Section 7(a)</u> above and distributions pursuant to <u>Section 7(c)</u> below (such distributions, "**Interim Distributions**"), the Series C Preferred Units, Series B Preferred Units and Series A Preferred Units will be deemed to be converted into Common Units (but no such conversion shall actually occur) if such conversion would result in greater distributions under this Section 7(b) to the holders of Series C Preferred Units ("**Series C Preferred Members**"),  Series B Preferred Units ("**Series B Preferred Members**") or Series A Preferred Units ("**Series A Preferred Members**"), as applicable. Interim Distributions shall be made as follows:

(i)  first, cumulative simple interest at a rate of eight percent (8%) per annum of such Series C Preferred Member's unreturned Capital Contributions in respect of Series C Preferred Units, pro rata, based on such Series C Preferred Member's unreturned Capital Contributions in respect of such Series C Preferred Units;

(ii)  second, cumulative simple interest at a rate of eight percent (8%) per annum of such Series B Preferred Member's unreturned Capital Contributions in respect of Series B Preferred Units, pro rata, based on such Series B Preferred Member's unreturned Capital Contributions in respect of such Series B Preferred Units;

(iii)  third, cumulative simple interest at a rate of eight percent (8%) per annum of such Series A Preferred Member's unreturned Capital Contributions in respect of Series A Preferred Units, pro rata, based on such Series A Preferred Member's unreturned Capital Contributions in respect of such Series A Preferred Units; and

(iv)  fourth, pro rata, to Members based on the number of Common Units held by them.

(c)    Liquidating Payments to Holders.  Upon any liquidation, dissolution or winding up of the LLC, whether voluntary or involuntary (a **"Liquidation Event"**) the Series C Preferred Units, the Series B Preferred Units and Series A Preferred Units of a Series C Preferred Member, Series B Preferred Member or Series A Preferred Member, as applicable, will be converted into Common Units if such conversion would result in greater distributions under this Section 7(c) to such Series C Preferred Member, Series B Preferred Member or Series A Preferred Member, as applicable. Distributions in connection with a Deemed Liquidity Event shall be made as follows:

(i) first, cumulative simple interest at a rate of eight percent (8%) per annum of such Series C Preferred Member's unreturned Capital Contributions in respect of Series C Preferred Units less any amounts distributed to such Series C Preferred Member pursuant to Section 7(b) in respect of such Series C Preferred Units, pro rata, based on such Series C Preferred Member's unreturned Capital Contributions in respect of such Series C Preferred Units;

(ii) second, 100% to each Series C Preferred Members pro rata, based on each such Series C Preferred Member's unreturned Capital Contribution in respect of such Series C Preferred Units immediately prior to the making of such distribution, until such time as the unreturned Capital Contributions in respect of such Series C Preferred Units of each Series C Preferred Member have been reduced to zero;

(iii) third, cumulative simple interest at a rate of eight percent (8%) per annum of such Series B Preferred Member's unreturned Capital Contributions in respect of Series B Preferred Units less any amounts distributed to such Series B Preferred Member pursuant to Section 7(b) in respect of such Series B Preferred Units, pro rata, based on such Series B Preferred Member's unreturned Capital Contributions in respect of such Series B Preferred Units;

(iv) fourth, 100% to each Series B Preferred Members pro rata, based on each such Series B Preferred Member's unreturned Capital Contribution in respect of such Series B Preferred Units immediately prior to the making of such distribution, until such time as the unreturned Capital Contributions in respect of such Series B Preferred Units of each Series B Preferred Member have been reduced to zero;

8

(v) fifth, cumulative simple interest at a rate of eight percent (8%) per annum of such Series A Preferred Member's unreturned Capital Contributions in respect of Series A Preferred Units less any amounts distributed to such Series A Preferred Member pursuant to Section 7(b) in respect of such Series A Preferred Units, pro rata, based on such Series A Preferred Member's unreturned Capital Contributions in respect of such Series A Preferred Units;

(vi) sixth, 100% to each Series A Preferred Member, pro rata, based on each such Member's unreturned Capital Contribution in respect of such Series A Preferred Units immediately prior to the making of such distribution, until such time as the unreturned Capital Contributions in respect of such Series A Preferred Units of each Series A Preferred Member have been reduced to zero; and

(vii) seventh, pro rata, to Members based on the number of Common Units and Incentive Units held by them.

Notwithstanding the foregoing, an Incentive Unit with an associated Strike Price shall not be included for purposes of, and shall not participate in, distributions pursuant to this Section 7(c) until an aggregate amount equal to the Strike Price associated with such Incentive Unit has been distributed after the issuance of such Incentive Unit pursuant to this Section 7(c). Solely for purposes of this Section 7(c), such Units shall not be considered to be issued or outstanding until such distributions have been made. Thereafter, such Units shall participate in any remaining amounts to be distributed in accordance with the provisions of this Section 7(c).

(d) _Amount Payable in Mergers, etc_. The Requisite Members may elect to have treated as a Liquidation Event: (i) any merger or consolidation of the LLC into or with another entity (except one in which the holders of interests of the LLC immediately prior to such merger or consolidation continue to hold at least a majority of the interests or voting power of the capital stock of the surviving entity) or (ii) any sale of all or substantially all of the assets of the LLC. If such election is made, all consideration payable to the Members of the LLC in connection with any such merger or consolidation, or all consideration payable to the LLC and distributable to its Members, together with all other available assets of the LLC (net of obligations owed by the LLC that are senior to the Preferred Units), in connection with any such asset sale, shall be, as applicable, paid by the purchaser to the holders of, or distributed by the LLC in redemption of, the Preferred Units and Common Units in accordance with the preferences and priorities set forth in Section 7(c) above, with such preferences and priorities specifically intended to be applicable in any such merger or consolidation, asset sale, as if such transaction were a Liquidation Event. The amount deemed distributed to Members upon any such transaction shall be the cash or the value of the property, rights or securities distributed to such holders by the LLC or the acquiring person, firm or other entity, as applicable. Any election by the Requisite Members pursuant to this Section 7(d) shall be made by written notice to the LLC at least five (5) days prior to the closing of the relevant transaction. Upon the election of the Requisite Members, all Members holding Preferred Units shall be deemed to have made such election and such election shall bind all Members.

(e) _Valuation of Securities or Other Non-Cash Consideration_. For purposes of valuing any securities or other noncash consideration to be delivered to Members in connection with any transaction to which Section 7(d) is applicable, the following shall apply:

(i) If any such securities are traded on a nationally recognized securities exchange or inter-dealer quotation system, the value shall be deemed to be the average of the closing prices of such securities on such exchange or system over the 30-day period ending three (3) business days prior to the closing;

9

        (ii)     If any such securities are traded over-the-counter, the value shall be deemed to be the average of the closing bid prices of such securities over the 30-day period ending three (3) business days prior to the closing; and

        (iii)     If there is no active public market for such securities or other noncash consideration, the value shall be the fair market value thereof, as determined in good faith by the Board of Managers.

        (f)     <u>No Violation</u>. Notwithstanding any provision contained herein to the contrary, the Company shall not make a distribution to any Member pursuant to this <u>Section 7</u> on account of such Member's Membership Interest if such distribution would violate Section 18-607 of the Act or other applicable law.

        8.     <u>Transfers of Interests</u>. No Member shall have the right to, directly or indirectly, sell, assign, give, hypothecate, pledge, mortgage or otherwise encumber or transfer (including, without limitation, any assignment or transfer by operation of law or by order of court) such Member's Units or any part thereof (including, without limitation, the granting of any participation therein or other right in respect thereof or rights or powers associated therewith or, in the case of a member which is an entity, any interest in such entity) (each such action, a **"Transfer"**), without the prior written consent of the Board of Managers or the Executive Committee.  In the event that any Member effectuates a Transfer of all or any part of such Member's Units in accordance with the terms hereof, the transferee of such Units shall be deemed to have made all Capital Contributions associated with such Units as of the dates that such Capital Contributions were made.  Any purported encumbrance or transfer in violation of the foregoing shall be null and void <u>ab initio</u> and of no effect whatsoever.  Each Member shall have the right to obtain injunctive relief (in addition to and not in lieu of any other remedies available to it) in the event of any breach of the foregoing.

        9.     <u>Representations and Warranties</u>. Each Member represents and warrants to the LLC and to the other Members and acknowledges as follows:

        (a)     Such Member is purchasing the Units for its own account, for investment only and not with a view to, or with any present intention of, effecting a distribution of such securities or any part thereof except pursuant to a registration or an available exemption under applicable law.

        (b)     The Units have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**") or the securities laws of any state or other jurisdiction and cannot be disposed of unless they are subsequently registered under the Securities Act and the securities laws of any applicable state or other jurisdiction or an exemption from such registration is available.

        (c)     Such Member understands that such Member has no contractual right for the registration under the Securities Act of such Member's Membership Interest for public sale and that, unless such Member's Membership Interest is registered or an exemption from registration is available, such Membership Interest may be required to be held indefinitely.

        (d)     Such Member has such knowledge and experience in financial, tax and business matters as to enable such Member to evaluate the merits and risks of such Member's investment in the LLC and to make an informed investment decision with respect thereto

        (e)     Such Member is able to bear the economic risk of such Member's investment in such Membership Interest.

(f)     Such Member has all requisite power and authority to enter into and perform this Agreement and this Agreement is and will remain such Member's valid and binding agreement, enforceable in accordance with its terms (subject, as to the enforcement of remedies, to any applicable bankruptcy, insolvency or other laws affecting the enforcement of creditors rights).

(g)     Such Member has received all documents, books and records pertaining to an investment in the LLC requested by such Member.  Such Member has had a reasonable opportunity to ask questions of and receive answers concerning the LLC, and all such questions have been answered to such Member's satisfaction.

10.     <u>Fiscal and Taxable Year</u>.  The fiscal year of the LLC shall be the same as the taxable year of the LLC.  The taxable year of the LLC shall be the calendar year, or such other year as may be required under the Code.

11.     <u>Term</u>.  The LLC shall have perpetual existence and shall not terminate upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued membership of a Member in the LLC; *provided, however*, the LLC shall dissolve and its affairs shall be wound up upon the first to occur of the following:

(a)     the written consent of the Board of Managers;

(b)     the entry of a decree of judicial dissolution under Section 18-802 of the Act.

Upon any such dissolution, the Board of Managers or the Board of Manager's delegate shall proceed to liquidate the assets of the LLC, having due regard for its obligations and the need for appropriate reserves.

12.     <u>Other Business</u>.  Ownership or participation in, or affiliation with, the LLC shall not limit or restrict any Member or Board Member or any affiliate of any Member or Board Member in any way in the pursuit of other business activities or investment opportunities, and no Member or Board Member shall be obligated to devote full time to the business of the LLC.

13.     <u>Indemnification</u>.

(a)     To the fullest extent permitted by law, the LLC shall indemnify each Member, the Board Members, officers of the LLC, and the officers, directors, partners, members and shareholders of any Member which is a corporation, partnership or limited liability company (each an **"Indemnified Party"** and collectively the **"Indemnified Parties"**), against any and all liability, costs, damages and expenses (including, without limitation, reasonable legal fees and expenses) incurred by and/or for any act performed by them in good faith within the scope of the authority conferred on them by this Agreement, and/or for any act in good faith omitted to be performed by them (including, without limitation, reasonable legal and other professional fees and expenses), except for their gross negligence or willful misconduct.

(b)     Upon approval of the Board of Managers, Expenses (including court costs and attorneys' fees) incurred in defending any proceeding shall be paid by the LLC in advance of the final disposition of such proceeding upon receipt of a written undertaking by or on behalf of an Indemnified Party to repay such amount, provided that such funds shall be repaid to the LLC if and to the extent it shall ultimately be determined by a final decision of a court of competent jurisdiction (that is not subject to appeal or as to which the time for appeal has expired) that the Indemnified Party is not entitled to be indemnified by the LLC pursuant to this Section.  The LLC shall have the right to control or conduct the defense of any proceeding as to which the LLC is required to advance expenses under this Section.

(c)     The indemnification and advancement of expenses provided by this <u>Section 13</u> shall continue as to any Person who has ceased to be an Indemnified Party, and shall inure to the benefit of the heirs, executors, administrators, and successors of Persons who themselves would have been entitled to seek indemnification under this Section.  For purposes of this <u>Section 13(c)</u>, **"Person"** shall mean any individual, corporation, partnership (general or limited), limited liability company, firm, joint venture, association, joint-stock company, trust, estate or unincorporated organization.

14.     <u>Liability of Members, Board Members and Officers</u>.  The Members shall not have any liability for the debts, obligations or liabilities of the LLC or of Board Members or officers or of any other Member, except to the extent required under the Act.  The Board Members and officers shall not have any liability for the debts, obligations or liabilities of the LLC or of any Member, except to the extent required under the Act.  No Member shall have the right to resign or withdraw or to be repaid any capital contributed by such Member or to receive any distribution or other payment in respect of its interest in the LLC, including, without limitation, as a result of the withdrawal or resignation of such Member from the LLC, except as specifically provided in this Agreement.  No Member shall have any right to have his or its interest in the LLC appraised and paid out under the circumstances provided in Section 18-210 of the Act.  No Member shall be entitled to receive any distribution or payment from the LLC under Section 18-604 of the Act or otherwise, except as specifically provided in this Agreement.

15.     <u>Amendment</u>.  This Agreement may be amended only pursuant to an affirmative vote or written consent of the Requisite Members.

16.     <u>Notices</u>.  Any and all notices under this Agreement shall be effective (a) on the third business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy or commercial expedited delivery service providing a receipt for delivery.  Any such notice shall be addressed to the LLC's registered office under the Act, if to the LLC, and to the Member's address as set forth on <u>Schedule A</u> (or to such other address of which the Members of the LLC have been notified in writing), if to a Member.

17.     <u>Governing Law</u>.  This Agreement and the relationship among the Members contemplated hereby shall be governed by the internal laws of the State of Delaware.

18.     <u>Entire Agreement</u>.  This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and thereof, and supersedes all prior agreements and understandings relating to such matter.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

MEMBERS:

**DOWNING INVESTMENT PARTNERS, LP**

By: _____
Name: _____
Title: _____

**DOWNING PARTNERS, LLC**

By: _____
Name: _____
Title: _____

**WAGNER IRREVOCABLE EDUCATION TRUST**

By: _____
Name: _____
Title: _____

_____

**RICHARD BUCKINGHAM**

**[Second A&R Limited Liability Company Agreement of Downing Digital Healthcare Group, LLC]**

| Downing Digital Healthcare Group, LLC ("DDHG"), a Delaware limited liability company (as of 6/2/14) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Investor | Class A Common | Series A Preferred | Series B Preferred | Series C Preferred | Options | Total Common Equivalents | Ownership % (Outstanding) | Ownership % (Fully-Diluted) |
| Downing Investment Partners, LP | 1,900,000 | | 215,901 | | | 2,115,901 | 75.14% | 75.14% |
| Downing Partners, LLC | | 175,000 | 1,663 | | | 176,663 | 6.27% | 6.27% |
| Wagner Irrevocable Education Trust | | | 831 | | | 831 | 0.03% | 0.03% |
| Richard Buckingham | 100,000 | | | | | 100,000 | 3.55% | 3.55% |
| | | | | | | 0 | | |
| Series C Preferred | | | | 422,500 | | 422,500 | 15.00% | 15.00% |
| | | | | | | | | |
| Reserved for Stock Option Plan | | | | | 0 | | 0.00% | 0.00% |
| TOTAL Issued and Reserved | 2,000,000 | 175,000 | 218,395 | 422,500 | 0 | 2,815,895 | 100.00% | 100.00% |

**Series C Preferred:**
Total Round = $4,500,000
Number Units = 422,500
Price per Unit = $10.65

# EXHIBIT C

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 10:02 AM 12/17/2013*
*FILED 09:14 AM 12/17/2013*
*SRV 131433462 - 5450344 FILE*

CERTIFICATE OF FORMATION
OF
Downing Digital Healthcare Group, LLC

The undersigned, being an authorized person for purposes of executing this Certificate of Formation on behalf of Downing Digital Healthcare Group, LLC, a Delaware Limited Liability Company (the "L.L.C."), desiring to comply with the requirements of 6 Del.C. Section 18-201 and the other provisions of the Delaware Limited Liability Company Act, 6 Del.C. Section 18-101, et seq. (the "Act"), hereby certifies as follows:

　　　1.　Name of the L.L.C. - The name of the L.L.C. is: Downing Digital Healthcare Group, LLC.

　　　2.　Registered Office and Registered Agent of the L.L.C. - The name of the registered agent for service of process on the L.L.C. in the State of Delaware is Agents and Corporations, Inc. The address of the registered agent of the L.L.C. and the address of the registered office of the L.L.C. in the State of Delaware is 1201 Orange Street, Suite 600, Wilmington, DE 19801.

　　　3.　Date of Formation and Effective Date - The date of formation and the effective date of the L.L.C. shall be the date of filing of this Certificate of Formation with the Secretary of State of the State of Delaware.

　　　IN WITNESS WHEREOF, the undersigned hereby executes this Certificate of Formation in accordance with the provisions of 6 Del.C. Section 18-201 on December 17, 2013.

John L. Williams
(Authorized Person)